### CARRIE WASFI ET AL. *v.* SHASHI CHADDHA ET AL.
### (13882)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and BORDEN, Js.

Argued January 11—decision released March 26, 1991

*William F. Gallagher,* with whom, on the brief, were *William R. Davis, Nicola E. Rubinow* and *Cynthia C. Bott,* for the appellants (plaintiffs).

*Ronald D. Williams,* with whom was *Ronald D. Williams, Jr.,* for the appellee (named defendant).

*Augustus R. Southworth III,* with whom, on the brief, was *Nancy P. Maxwell,* for the appellee (defendant Frank J. Riccio).

SHEA, J. The named plaintiff, Carrie Wasfi,[1] sued the defendants for medical malpractice in the diagnosis and treatment of an acoustic neuroma.[2] Specifically, she claimed that the defendant Shashi Chaddha, a radiologist, had negligently failed to detect the presence of an acoustic neuroma when he performed a CAT scan[3] on her in May, 1981, and that the defendant Frank J. Riccio, an otolaryngologist,[4] had negligently failed to diagnose and treat the acoustic neuroma in October, 1982, after she reported a sudden hearing loss.[5] The neuroma, and its subsequent surgical removal in 1983, caused total hearing loss in Wasfi's right ear, facial paralysis, hemiparesis[6] of the left side, and voice loss. After a twenty-day trial, the jury returned verdicts in favor of the defendants. Wasfi appealed, claiming numerous errors in the trial court's instructions to the jury. We affirm the judgment.

---

[1] The other plaintiff in this case was Carrie Wasfi's husband, Amr. He sought damages for loss of consortium based upon the same facts alleged by his wife. Throughout this opinion, the name "Wasfi" refers to Carrie Wasfi.

[2] An "acoustic neuroma" is "a progressively enlarging, benign tumor within the auditory canal arising from the eighth cranial (acoustic) nerve." R. Sloane, Sloane-Dorland Annotated Medical-Legal Dictionary (1987) p. 496.

[3] A "CAT scan" or computerized axial tomography (sometimes referred to as a "CT scan") is defined as "the gathering of anatomical information from a cross-sectional plane of the body, presented as an image generated by a computer synthesis of x-ray transmission data obtained in many different directions through the given plane"; Stedman's Medical Dictionary (24th Ed.) p. 1459; in other words, an X ray that shows more than just bones.

[4] An otolaryngologist is a physician specializing in "that branch of medicine concerned with medical and surgical treatment of the head and neck, including the ears, nose and throat." R. Sloane, Sloane-Dorland Annotated Medical-Legal Dictionary (1987) p. 520.

[5] Wasfi also brought suit against her family physician, Joseph Sciarrillo, and against St. Vincent's Medical Center, on account of its alleged agency relationship with Chaddha. She withdrew her complaint against Sciarrillo before trial and the court directed judgment for St. Vincent's. She has not appealed from the directed judgment.

[6] "Hemiparesis" is defined as "muscular weakness or partial paralysis affecting one side of the body"; R. Sloane, Sloane-Dorland Annotated Medical-Legal Dictionary (1987) p. 333; or "slight paralysis affecting one side only." Stedman's Medical Dictionary (24th Ed.) p. 631.

The jury could reasonably have found the following facts. Since childhood, Wasfi had suffered from diabetes. At various times between 1977 and 1981, she had experienced visual and other problems linked to diabetes and had undergone hospital treatment.

In 1981, Wasfi sought treatment for recurring headaches from her family physician, Joseph Sciarrillo. Sciarrillo ordered X rays, a CAT scan and an electroencephalogram (EEG). Chaddha was the radiologist who performed the CAT scan. Chaddha later testified that he had not been fully informed of Wasfi's symptoms prior to evaluating the CAT scan results. In any event, Chaddha reported to Sciarrillo that the CAT scan result was normal. Sciarrillo prescribed headache medication for Wasfi, which had some positive effects.

In October, 1982, Wasfi noticed sudden loss of hearing in one ear when she attempted to use the telephone. She went to Joseph Riccio, an otolaryngologist, told him of the hearing loss, and also reported headaches, a recent cold and "lightheadedness." Riccio conducted some office tests and told Wasfi that the hearing loss might be viral (related to her cold) or vascular (related to her diabetes). He recommended "carbogen therapy," a treatment involving inhalation of a mixture of carbon dioxide and oxygen intended to open a blocked ear vessel. Riccio arranged for other practitioners to perform the therapy and advised Wasfi to contact him after the therapy was complete. Had Wasfi reported continued hearing loss following such treatment, he would at that time have recommended a CAT scan.

Wasfi discussed the suggested carbogen therapy with her husband. After the discussion, she decided not to undergo the carbogen therapy. Wasfi did not inform Riccio of her decision and did not contact him again, although her hearing did not improve. Six months after

her visit to Riccio, she began to experience severe headaches. After a month of the headaches, in May, 1983, she returned to her family physician, Sciarrillo. When a second CAT scan revealed the presence of a tumor, Sciarrillo immediately had her admitted to a hospital, where the neuroma was removed.

At the trial, experts on both sides testified concerning, inter alia, the propriety of Riccio's prescription of carbogen therapy prior to ordering a CAT scan. The thrust of Riccio's evidence was that when a patient suffers a hearing loss that may be caused by dozens of nonthreatening conditions, doctors routinely attempt to screen out such conditions before ordering a CAT scan, which would be used to detect a more serious cause for the hearing loss; that if carbogen therapy is successful in restoring hearing, it would also rule out more serious causes for the hearing loss; and that Riccio's decision to recommend carbogen therapy before ordering a CAT scan was only an application of this standard practice. In addition, Riccio's counsel elicited expert testimony to the effect that the timing of the CAT scan—before carbogen therapy or after carbogen therapy—was a matter of professional opinion as to which physicians differed. Finally, both defendants offered evidence that by the time Wasfi came to Riccio for treatment, no CAT scan would have made a difference, for the damage had already been done.

The trial court included in its charge to the jury specific instructions on (1) "intervening cause" and (2) "schools of thought" as they affect the standard of care. After the charge was given, court adjourned for the weekend.

When court resumed, the parties presented their exceptions to the charge. Wasfi excepted to the "schools of thought" charge as unwarranted by the evi-

dence, and all parties excepted to the instruction on intervening cause. Persuaded by some of the exceptions, the trial court gave a revised instruction on the subject of proximate cause in an attempt to eliminate the problems with the earlier charge on intervening cause. It did not revise or delete the instruction on "schools of thought." It explained the verdict forms, which provided for a general verdict as to each defendant, but no special interrogatories were submitted. The jury began deliberating that day.

The next day the jury requested clarification of the intervening cause instruction. In response, the court told the jury to disregard the second instruction and issued a third and final instruction on intervening cause. Introducing the third charge, the judge said "I'm going to go back in part to my original charge." Wasfi's and Riccio's counsel both took exception to that statement as well as to other parts of the charge. After deliberating another day, the jury returned general verdicts in favor of Riccio and Chaddha. On appeal, Wasfi challenges the trial court's charges on (1) "schools of thought" and (2) intervening cause.

## I

Wasfi contends that the trial court improperly gave an instruction on "schools of thought" when there was no evidence that Riccio had adhered to and acted according to the dictates of a particular school of medical thought distinct from that followed by her own expert witnesses.

The trial court included the disputed instruction in its first charge to the jury, and did not revise it in giving the subsequent curative instructions. The disputed instruction followed a lengthy general instruction on medical malpractice, including the applicable standard

of care.[7] After this instruction, the trial court discussed the claims against each doctor. As to Wasfi's claims against Riccio, the trial court stated:

"Now as to Dr. Riccio who undertook treatment of Mrs. Wasfi in his capacity as otolaryngologist, it is his alleged failure to properly diagnose and order proper follow-up studies when he saw Mrs. Wasfi in his office on October 29th, 1982, which is the gravamen of their claim against him. In essence, however, this claim is substantially the same as that presented against Dr. Chaddha. That is the failure to timely and skillfully diagnose her ailment. Consequently the same principles of law that apply to Dr. Chaddha relating to a physician's duty to properly diagnose a patient's ailment apply with equal force to Dr. Riccio."

The court then gave the challenged instruction:

---

[7] Thus, before giving the disputed instruction, the trial court charged the jury on the standard of care in medical malpractice cases: "Now medical malpractice can be defined simply as the unskillful treatment by a physician, and in consequence a person is injured. Physicians are liable for professional negligence if they fail to exercise that degree—that degree of skill, care and diligence ordinarily had and exercised by physicians engaged in the same line of practice at the time of the act or omission in question. Of course, in this case, the lines of practice we are concerned with are radiology with respect to Dr. Chaddha and otolaryngology or ear, nose and throat specialist with respect to Dr. Riccio.

\* \* \*

"[I]t was the duty of the defendant physicians to exercise reasonable care, skill and diligence—with emphasis on the word reasonable—in diagnosing the illness with which Mrs. Wasfi was afflicted while a patient under their professional care. That duty was fulfilled if each of the defendants exercised that degree of care, skill, and diligence which such medical specialists ordinarily had and exercised in such cases at that time.

\* \* \*

"The standard of care is not concerned with what may be the ideal care and treatment in a particular case, but rather the law requires only that an ordinary degree of skill, care and diligence be exercised or given commensurate with that had and exercised in the specialty in which the physician in question practices. As you can see, whether we're talking about Dr.

"There is, however, one specification of negligence that is peculiar to Dr. Riccio. That specification appears in paragraph 8e of the third count of the complaint and is in essence a claim that Dr. Riccio prescribed a course of treatment that was unsuited for Mrs. Wasfi's condition.

"There has been testimony in this case that Dr. Riccio elected a certain course of treatment for Carrie Wasfi's condition as he understood it in 1982, to wit: carbogen therapy. There has also been testimony that another course of treatment should have been undertaken and that is ordering a CAT scan. Now there may be more than one established system of diagnosis and treatment. While the law recognizes that there are different schools of thought in this regard, it does not favor or give exclusive recognition to any particular system of diagnosis and treatment over another.

"The law is that a physician is not bound to use any particular method or medical school of thought in diag-

Chaddha today or Dr. Riccio, it is not the result that is important in determining whether or not the physician was negligent. It is the physician's conduct as it relates to the standard of care which is the subject of your examination.

* * *

"In this case, there has been expert testimony regarding both the standard of care regarding CAT—of reading CAT scans in connection with the diagnosis of tumors and in particular the diagnosis of acoustic neuromas by radiologists in 1981. There has also been expert testimony regarding clinical diagnosis and care by otolaryngologists of patients presenting symptoms such as those presented by Mrs. Wasfi in October of 1982.

"However, although you may rely on the experts to tell you what the proper standards are in this case, it is still up to you, using that standard as a guide, to measure and determine what the facts are. You the jury must determine from all of the conflicting evidence and opinions whether or not this—in this case Dr. Chaddha or Dr. Riccio or both of them as the case may be failed to comply with or measure up to the appropriate standard of care; and if you find that either or both of them deviated from that standard of care, then you must determine whether or not that deviation was a proximate cause of Carrie Wasfi's injuries, disabilities and losses."

nosing his patient. When a physician of ordinary skill and learning recognizes several methods of diagnosis as proper, the defendant may adopt any such methods without subjecting himself to liability [for] an unfortunate result so long as such method of diagnosis is consistent with the skill, care and diligence ordinarily had and exercised by other specialists in his field in like cases at that time he undertook that function. Thus, if you were—if there were several established methods of diagnosis recognized at the time Dr. Riccio saw Mrs. Wasfi in his office on October, 1982, the test is not whether Dr. Riccio adopted a method another doctor might not adopt, but whether the method he did adopt was one that was in compliance with the standard of care, skill and diligence required of the particular school of thought embracing that method.

"Therefore, you must decide whether or not the carbogen therapy prescribed by Dr. Riccio for Wasfi was an established diagnostic modality under any recognized school of thought or in cases such as Mrs. Wasfi presented to him in October of 1982. If you find by a fair preponderance of the evidence that carbogen therapy was not consistent with any established diagnostic modality for cases such as Mrs. Wasfi's, then it would be negligent for Dr. Riccio to employ it on Mrs. Wasfi. If, however, you conclude that such a diagnostic modality was an established modality for treating patients in like cases, by ordinarily prudent radiologists [sic] in October of 1982, then Dr. Riccio was not negligent in using it."

Seizing upon the trial court's use of the term "schools of thought," Wasfi assumes that the foregoing charge purported to summarize the principle that the law will not judge between different medical "schools of thought" so long as a physician acts according to the standards within that "school." *Force* v. *Gregory,* 63

Conn. 167, 171, 27 A. 1116 (1893). She contends, correctly, that such a charge on "schools of thought" would be improper where, as here, no evidence was offered that Riccio adhered to a "recognized school of good standing, which has established rules and principles of practice for the guidance of all its members, as respects diagnosis and remedies, which each member is supposed to observe in any given case." 61 Am. Jur. 2d, Physicians, Surgeons and Other Healers § 214, p. 345; see *Katsetos* v. *Nolan,* 170 Conn. 637, 652, 368 A.2d 172 (1976); *Geraty* v. *Kaufman,* 115 Conn. 563, 571, 162 A. 33 (1932); *Force* v. *Gregory,* supra; *Bryant* v. *Biggs,* 331 Mich. 64, 73–78, 49 N.W.2d 63 (1951); but see *Furey* v. *Thomas Jefferson University Hospital,* 325 Pa. Super. 212, 224–25, 472 A.2d 1083 (1984) (different schools of thought exist where competent medical authority is divided).

Riccio offered no evidence that his conduct was in accordance with such a distinct "school of thought." Instead his evidence tended simply to show that whether, after a tentative diagnosis of a viral or vascular cause for hearing loss, it was proper to recommend carbogen therapy prior to a CAT scan was a matter of professional opinion—in other words, within the normal range of professional discretion exercised by competent otolaryngologists.

Despite the unfortunate use of the term "schools of thought," we believe that the trial court did not instruct on "schools of thought," but instead, correctly stated the settled principle that "where the treatment or procedure is one of choice among competent physicians, a physician cannot be held guilty of malpractice in selecting the one which, according to his best judgment, is best suited to the patient's needs." *Ball* v. *Mallinkrodt Chemical Works,* 53 Tenn. App. 218, 224, 381 S.W.2d 563 (1964); *O'Neill* v. *Kiledjian,* 511 F.2d 511,

513 (6th Cir. 1975); 61 Am. Jur. 2d, Physicians, Surgeons and Other Healers § 216; see also *Meier* v. *Ross General Hospital,* 69 Cal. 2d 420, 434, 445 P.2d 519, 71 Cal. Rptr. 903 (1968); *Huffman* v. *Lindquist,* 37 Cal. 2d 465, 473–75, 234 P.2d 34 (1951).

Because the court included language appropriate to an instruction on the "schools of thought" doctrine, the charge may have been confusing to lawyers, to whom "schools of thought" is a term of art. There is no reason, however, to believe that the jury suffered from any such linguistic preconceptions. Taken as a whole, the charge adequately conveyed to lay persons the principle that physicians may choose between alternative acceptable methods without incurring liability solely because that choice may have led to an unfortunate result.

In the context of her attack on the charge as a "schools of thought" instruction, Wasfi contends that even the principle of acceptable alternatives requires, as a predicate, that the physician first make a "careful diagnosis." This contention assumes that there may be acceptable alternatives of *treatment,* but that only one correct method of *diagnosis* is possible. Thus, she argues that failure to order a CAT scan was a failure to diagnose and that carbogen therapy was an incorrect method of diagnosis, to which the schools of thought principle could not apply.[8]

---

[8] The charge in some places uses the terms "treatment" and "diagnosis" interchangeably. The evidence indicated that carbogen therapy is a practical method of removing the *symptom* of hearing loss. There are many *causes* of hearing loss, not all of them known. If hearing loss was originally caused by, for example, a temporary condition no longer present, such as a virus, the carbogen therapy may eliminate the hearing loss by opening blocked aural passages. If the hearing loss is caused by a more permanent or serious condition, carbogen therapy cannot eliminate it. Thus, as to temporary conditions, carbogen therapy may be a system of "treatment"; as to more serious, permanent conditions, carbogen therapy serves as a

We can perceive no reasoned basis for recognizing a physician's latitude in selecting alternative acceptable methods of treatment, but denying him the same latitude in selecting alternative acceptable methods of diagnosis, or, in the words of the trial court, "diagnostic modalities."[9] So long as a method is approved by the profession as a whole, or there is an unresolved conflict within the profession concerning the wisdom of the method, it matters not that the method is used for diagnosis rather than treatment.

The "diagnostic modality" used by Riccio was to try carbogen therapy before, not after, a CAT scan. Riccio elicited testimony from Wasfi's expert, Gale Ramsby, chief of cardiovascular radiology at the University of Connecticut Health Center, that it would not be unusual for a physician to rule out a viral or vascular cause for hearing loss before ordering a CAT scan, or to recommend therapy and weigh its results before considering a CAT scan. Diran Mikaelian, an otolaryngologist, another of Wasfi's experts, admitted that he had testified at his deposition that whether Riccio's conduct breached the standard of care was "a matter of opinion," although he insisted at trial that the CAT scan should be performed before prescribing carbogen therapy. Clarence Sasaki, chief of the department of otolaryngology at the Yale University School of Medicine, testified that while a CAT scan was recommended

---

diagnostic tool by screening out other causes of the hearing loss. Riccio made a tentative diagnosis that Wasfi's hearing loss was originally caused by a virus or resulted from her diabetes. He prescribed carbogen therapy (1) to treat the symptom and (2) to diagnose the cause. He did not claim to have used the therapy to *treat* the cause itself, in this case, the acoustic neuroma.

[9] Without such latitude, physicians may resort to "defensive medicine" such as unnecessary and sometimes hazardous testing (e.g., excessive numbers of X rays). See 3 F. Harper, F. James & O. Grey, Torts § 17.3 n.6; note, "Rethinking Medical Malpractice Law in Light of Medicare Cost-Cutting," 98 Harv. L. Rev. 1004, 1012–13 (1985).

at some point, it might not be ordered at all if other preliminary therapy was successful. The testimony of these experts constituted sufficient evidence that Riccio's "diagnostic modality" was within the range of acceptable medical options so as to justify the court's charge.

Wasfi contends that our holding will open a "Pandora's Box," shielding a defendant physician from liability every time experts differ concerning his choice of techniques. We disagree. After the plaintiff has presented a prima facie case, the defendant physician who claims that he employed one of several alternative methods accepted within his profession has no less a task than any defendant physician: to offer credible expert evidence that his conduct *was* accepted within the profession, and to persuade the jury to believe that evidence. It is true that an instruction on alternative acceptable methods may tempt jurors to decide that *both* sets of experts are right, instead of forcing them to make a difficult choice between opposing experts. The difficulties faced by lay jurors when evaluating expert evidence are, however, endemic to our system of trial by jury. We presume that the jury will abide by its duty to make a thoughtful, reasoned decision, applying its common sense and logic to the evidence presented. Cf. *State* v. *Artis,* 198 Conn. 617, 623, 503 A.2d 1181 (1986) (*Healey, J.,* concurring). In this case, the jury would certainly have been justified in concluding that there was a difference of opinion within the profession regarding the timing of a CAT scan for a patient afflicted with a sudden unilateral hearing loss. We do not know, of course, whether the jury found that such a difference of opinion existed, or whether it simply believed Riccio's course of action was the only right course of action, since no special interrogatories were submitted to the jury.

## II

In addition to the supposed "schools of thought" charge, Wasfi challenges all three instructions on intervening cause, even though the judge specifically told the jury to disregard the two earlier charges. Since those instructions were withdrawn we need consider only the final instruction, upon which the jury is presumed to have relied. *State* v. *Cobb,* 199 Conn. 322, 329, 507 A.2d 457 (1986); *State* v. *Cavros,* 196 Conn. 519, 528, 494 A.2d 550, cert. denied, 474 U.S. 904, 106 S. Ct. 233, 88 L. Ed. 2d 232 (1985); *Willametz* v. *Guida-Seibert Dairy Co.,* 157 Conn. 295, 301, 254 A.2d 473 (1968). That supplemental charge is set forth in the footnote.[10]

Wasfi first claims that the third charge invited the jury to consider the doctrine of intervening cause as

[10] "The law of intervening cause is this: One whose negligence in the first instance creates or increases the risk of harm is not relieved from responsibility for such harm by the fact that someone else contributes to that harm by another act of negligence so long as the resulting harm suffered was reasonably foreseeable by the defendant. On the other hand, a defendant is not liable if the plaintiff's harm was caused by an independent source which intervenes between that defendant's negligence and the plaintiff's resulting condition and produces a result which was not reasonably foreseeable by the defendant. The test then is whether the harm which occurred was [of] the same general nature as the foreseeable risk created or increased by the physician's negligence.

"Therefore, if you find that Dr. Chaddha could in 1981 reasonably foresee or anticipate that Mrs. Wasfi was likely to suffer the harm of the general nature that she did suffer as a result of his failure to skillfully diagnose the acoustic neuroma and you also find that Dr. Riccio could in 1982 similarly foresee that Mrs. Wasfi was likely to suffer similar consequences that she did in fact suffer as a result of his professional negligence, then neither physician would escape legal responsibility for those injuries or harm. Rather, because of the negligence of the other, Dr. Riccio, the second treating physician here, could only escape legal responsibility for the resulting harm to Mrs. Wasfi if he could not reasonably foresee or anticipate the harm that was likely to occur because of his own negligence. Consequently, Dr. Riccio's negligence would be an intervening cause that broke the chain of causation between his negligence and the harm suffered by the plaintiff."

a basis for excusing Riccio from liability for his negligence when it was unquestionably inapplicable to him. Because Wasfi never consulted Riccio until eighteen months after the CAT scan performed in May, 1981, it is clear that Chaddha's alleged negligence in interpreting the CAT scan could not constitute an intervening force that would attenuate the causal relationship between any negligence on the part of Riccio and any harm therefrom suffered by Wasfi. "An intervening force is one which actively operates in producing harm to another *after* the actor's negligent act or omission has been committed." (Emphasis added.) 2 Restatement (Second), Torts § 441 (1).

We disagree with Wasfi, however, that the portion of the third charge cited[11] in support of her claim should be construed as making any negligence of Chaddha a ground for a verdict in favor of Riccio. The jury was told that "[r]ather, because of the negligence of the other, Dr. Riccio, the second treating physician here, could only escape legal responsibility for the resulting harm to Mrs. Wasfi if he could not reasonably foresee or anticipate the harm that was likely to occur because of *his own* negligence." (Emphasis added.) While not a model of clarity, this statement may reasonably be viewed as indicating that Riccio could "only escape" liability for his negligence if the consequences thereof were not reasonably foreseeable, regardless of any negligence on the part of Chaddha.

The last sentence of the charge, stating that Riccio's negligence "would be an intervening cause that broke

---

[11] Wasfi cites the last two sentences of the third charge. "Rather, because of the negligence of the other, Dr. Riccio, the second treating physician here, could only escape legal responsibility for the resulting harm to Mrs. Wasfi if he could not reasonably foresee or anticipate the harm that was likely to occur because of his own negligence. Consequently, Dr. Riccio's negligence would be an intervening cause that broke the chain of causation between his negligence and the harm suffered by the plaintiff."

the chain of causation between *his* negligence and the harm suffered by the plaintiff," (emphasis added) was obviously jumbled, but it certainly does not refer to Chaddha or imply that Chaddha's negligence could be a basis for excusing Riccio. This incomprehensible last sentence was not called to the attention of the court by anyone, nor did any party except to the third charge on the ground that it made Chaddha's negligence a basis for excusing Riccio from liability. Such an exception had been voiced after the first charge, which abstractly posed the intervening cause issue of "whether physician A's negligence was an intervening cause between physician B's negligence and the resulting harm *or vice versa*; and thus determine whether *one or the other of the physicians* would be relieved from liability for his acts." (Emphasis added.) The second charge, which was in accordance with Wasfi's request,[12] made no reference that could possibly be construed to suggest that Chaddha's negligence could excuse Riccio, nor was any exception taken in that regard. Evidently the parties did not believe that such a basis for finding Riccio not to be liable was implicit in the third charge, because no such exception was taken. The failure of a party to except specifically to a defect in the charge, of course, precludes reliance

---

[12] Wasfi's request to charge was as follows: "Negligence of Medical Provider as Intervening Cause

"Under our law, a tortfeasor, or someone who has negligently caused injury to another, cannot escape liability for the consequences of his action, even if the injured party obtains medical care and treatment that worsens, rather than improves, her condition. If the defendant's negligence is a substantial factor, or proximate cause, in producing the plaintiff's injuries, then it matters not that a physician who treats these injuries failed to use appropriate skill and medical care. The injured plaintiff who has exercised reasonable care in the selection of a physician is not responsible for his unskillful treatment of the case, but may recover from him who is responsible for his primary injury, the damages caused through an aggravation, or failure to provide proper treatment for, the underlying injury by the treating doctor. Thus, under the circumstances of this case, should you find that Dr. Chaddha caused injury to Carrie Wasfi by reason of his negligent failure

upon it as a basis for reversal. Practice Book § 315.[13]
Wasfi's request to charge, which referred to circum-
stances under which Chaddha would be liable for the
consequences of Riccio's possible negligence, cannot
be deemed to have preserved this issue for review,
because the request, if given, would not have cured the
defect now claimed in the charge, and was otherwise
flawed. Accordingly, we reject Wasfi's claim that the
jury was sufficiently misled by the charge to find in
favor of Riccio on the ground that Chaddha's negli-
gence was an intervening cause.

Wasfi also claims that the third charge was defec-
tive because its references to reasonable foreseeabil-
ity as a limitation upon liability for a negligent act were

---

to diagnose her acoustic neuroma, and should you find that Carrie Wasfi
exercised reasonable care in her selection of Dr. Riccio to treat the hear-
ing loss that developed as the result of growth of the undiagnosed tumor,
Dr. Chaddha will be responsible for all injuries caused to Carrie Wasfi as
the result of his negligence in interpreting the CT scan of May 22, 1981,
even though Dr. Riccio may have failed to act properly in his diagnosis or
treatment of the patient. *Anderson & McPadden, Inc.* v. *Tunucci*, 167 Conn.
584, 596 [356 A.2d 873 (1975)]; *Wright* v. *Blakeslee*, 102 Conn. 162, 167–168
[128 A. 113 (1925)].''

The second charge, which conformed to this request, was not withdrawn
until after the jury asked for a ''rereading'' of the intervening cause part
of the charge. Chaddha's attorney had objected to this charge, pointing
out that it never defined ''what an intervening act is or how an interven-
ing act of someone else might supersede the negligence of someone who
was first in line.'' We agree that this request, as well as the charge based
thereon, did not adequately explain the circumstances under which the pos-
sible negligence of Riccio might supersede that of Chaddha, because the
element of foreseeability as a limitation on Chaddha's liability was entirely
omitted.

[13] Practice Book § 315 provides as follows: ''The supreme court shall not
be bound to consider error as to the giving of, or the failure to give, an
instruction unless the matter is covered by a written request to charge or
exception has been taken by the party appealing immediately after the
charge is delivered. Counsel taking the exception shall state distinctly the
matter objected to and the ground of objection. Upon request, opportu-
nity shall be given to present the exception out of the hearing of the jury.''

erroneous.[14] At trial she excepted "again to the language dealing with foreseeability," having raised a similar objection to the first charge.

The focus of Wasfi's criticism of the references to foreseeability is not that such a concept is wholly irrelevant to the causal relationship between a negligent act and the harm flowing therefrom for which a defendant may be held responsible, but that the wording of the charge implied that the "precise damages" or "particular injury" suffered by Wasfi had to be reasonably foreseeable. Reviewing the third charge as a whole, as we must; *Oberempt* v. *Egri,* 176 Conn. 652, 656, 410 A.2d 482 (1976); we are not persuaded that it conveyed to the jury the impression that either defendant should be excused from liability for his negligence simply if he could not reasonably have foreseen the precise nature or extent of the harmful consequences that actually were suffered by Wasfi. In this charge the jury was told that "a defendant is not liable if the plaintiff's harm was caused by an independent source which intervenes between that defendant's negligence and the plaintiff's resulting condition and *produces a result which was not reasonably foreseeable by the defendant.* The test then is *whether the harm which occurred was the same general nature as the foreseeable risk created or increased* by the physician's negligence." (Emphasis added.) The court instructed more specifically that, "if you find that Dr. Chaddha could in 1981 reasonably foresee or anticipate that Mrs. Wasfi was likely to suffer the *harm of the general nature that she did suffer* as a result of his

---

[14] Our conclusion that the third charge did not suggest to the jury that Chaddha's negligence, if any, might be an intervening cause such as to excuse Riccio from liability does not obviate the need to discuss the claim relating to foreseeability. The charge made foreseeability a limitation on the causal relationship between the possible negligence of each physican and the harm sustained by the plaintiff, apart from the issue of intervening cause.

failure to skillfully diagnose the acoustic neuroma . . . neither physician would escape legal responsibility for those injuries or harm." (Emphasis added.)

Wasfi, in excepting to "the language dealing with foreseeability" in the third charge, also claimed "that the error that was made [in the first charge] on the subject matter is one that cannot and has not been corrected." We disagree. The first charge at some points had phrased the foreseeability element of proximate cause in terms of producing "a result which was not reasonably foreseeable" and foreseeing "the condition or conditions that Mrs. Wasfi claims to have suffered," and an appropriate exception was taken. We are convinced that the third charge did not contain these infirmities and sufficiently stated the test we have used for determining proximate cause, "whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence." *Merhi* v. *Becker,* 164 Conn. 516, 521, 325 A.2d 270 (1973); see *Tetro* v. *Stratford,* 189 Conn. 601, 605, 458 A.2d 5 (1983); *Coburn* v. *Lenox Homes, Inc.,* 186 Conn. 370, 384, 441 A.2d 620 (1982).

Another claim of error in the jury instructions is that the withdrawal of the second charge, which virtually adopted Wasfi's request[15] verbatim, deprived her of a charge on the principle that a defendant whose negligence is a substantial factor in producing an injury is liable "for damages caused by the negligence of a doctor in treating the injury which the tort-feasor caused, provided the injured party used reasonable care in selecting the doctor." *Anderson & McPadden, Inc.* v. *Tunucci,* 167 Conn. 584, 596, 356 A.2d 873 (1975). The evidence in this case, however, provided no basis for applying this principle, because it is undisputed that

---

[15] See footnote 12, supra.

Wasfi never followed the course of treatment recommended by Riccio and her condition was not made worse as a result of her contact with him. The court properly withdrew this charge because it was inapplicable to the evidence and would only have confused the jury on the issue of intervening cause, which the court purported to address.[16] Furthermore, we must infer from the verdict in favor of Riccio, in which we have found no flaw, that the jury found that he had committed no wrongful act that resulted in any harm to Wasfi. Even if this request of the plaintiff were appropriate, therefore, its omission would have been a harmless error.

Wasfi's final claim is that the third charge did not contain language to indicate that, for an intervening force to excuse a person from being liable for harm that his negligence would otherwise be deemed a substantial factor in producing, it must entirely supersede the operation of the antecedent negligence. The third charge included the instruction that "a defendant is not liable if the plaintiff's harm was caused by an *independent source* which intervenes between that defendant's negligence and the plaintiff's resulting condition and produces a result which was not reasonably foreseeable by the defendant." We agree that this charge was deficient in failing to inform the jury that the "independent source" must be of such great causal significance as to attenuate the effect of the prior negligence to the extent that it can no longer be regarded as a substantial factor in producing the harm

---

[16] The trial court prefaced its second charge with the following remarks: "Ladies and gentlemen, it's been brought to my attention by the attorneys that one of the charges that I gave to you was somewhat long and somewhat confusing. So I'm going to recharge you on the subject and the subject that we were talking about was intervening cause. Now I want you to disregard all that I said about intervening cause and the law of intervening cause and I want you to follow the law as I give it to you now."

involved. See *Kiniry* v. *Danbury Hospital,* 183 Conn. 448, 455–56 n.2, 439 A.2d 408 (1981);[17] *D'Arcy* v. *Shugrue,* 5 Conn. App. 12, 24–25, 496 A.2d 967, cert. denied, 197 Conn. 817, 500 A.2d 1336 (1985); 2 Restatement (Second), Torts §§ 441–453. This deficiency, however, was never mentioned in any of the exceptions taken to the third charge as required. Furthermore, since this aspect of the charge concerned only whether Chaddha's negligence had been superseded by that of Riccio, whom the jury verdict has necessarily exonerated, the omission relied on by Wasfi would constitute a harmless error. Unless Riccio were a wrongdoer who had proximately caused harm to Wasfi, his actions could not have been an intervening cause in any event. *Corey* v. *Phillips,* 126 Conn. 246, 255, 10 A.2d 370 (1939); *D'Arcy* v. *Shugrue,* supra; see W. Prosser & W. Keeton, The Law of Torts (5th Ed. 1984) § 44.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[17] In *Kiniry* v. *Danbury Hospital,* 183 Conn. 448, 455–56 n.2, 439 A.2d 408 (1981), this court implicitly approved a charge on intervening cause in a physician malpractice case as follows: " 'Therefore, even though you might find that the defendant, Dr. [F], was negligent in one or more of the particulars alleged in the complaint, if you find that Dr. [F]'s negligence ceased to be a substantial factor in producing Mr. [K]'s death and that the negligence of Dr. [M] had so superceded that of Dr. [F], that Dr. [M], without the negligence of Dr. [F] contributing to any material degree, was the real cause for Mr. [K]'s death, then the negligence of Dr. [F] would not be a proximate cause of Mr. [K]'s death, if you find Dr. [F] was negligent, and the defendant, Dr. [F], would not be liable to the plaintiff.' "