[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 13909
This is a case sounding in medical malpractice, tried to the court in approximately ten sessions. The plaintiff Joanne Gambardella claims, essentially, that the defendant gynecologist, Emily Fine, deviated from the applicable standard of care in treating a post-surgical infection. The defendant disagrees, and claims that she did adhere to the standard of care and advances other claims, including lack of causation, as well. Both sides presented expert testimony and a number of learned treatises, texts and articles.
The factual background may be summarized as follows.[1] The defendant is a licensed physician board certified in gynecology. The plaintiff began seeing Dr. Fine on January 10, 1991. In January, 1994, Gambardella reported menorraghia, or abnormally heavy menstrual discharge. Various treatment options were discussed; after some hesitation, Gambardella decided to have a vaginal hysterectomy performed, because there was assurance that that procedure would be sure to solve the immediate problem. A pelvic ultrasound prior to surgery showed a fibroid, and on May 18, 1994, the vaginal hysterectomy was performed. Gambardella had signed an informed consent form which alerted her to the possibility of post-surgical infection. The surgery was uneventful, and routine follow-up ensued.
On May 27, 1994, Gambardella presented with diarrhea, vomiting, chills, an elevated temperature and reportedly some spiking to 103 degrees. Fine examined her and took a history; she suspected possible food poisoning or, as a secondary diagnosis, infection following surgery. She prescribed floxin, an antibiotic, to address infection. Floxin is known to be effective against enterococcus, the sort of bacteria which turned out to be the culprit.
The patient felt better temporarily, but was seen again on May 30 with a recurrence of symptoms. Dr. Fine referred her to Dr. LaGarde, a gastroenterologist, and switched her to flagyl, a medication which apparently is also effective against intestinal "bugs".
On May 31, 1994, the patient saw Dr. Ruffolo, her primary care physician. She reported vomiting and severe diarrhea, so she stopped taking antibiotics.[2] Dr. Ruffolo administered a CT Page 13910 steroid.[3] On June 1 and June 2 Gambardella was reportedly feeling somewhat better, but she did see Dr. LaGarde, the gastroenterologist, on June 3, 1994. As it developed, there was no food poisoning (or if there were, it was coincidental and it resolved). Dr. LaGarde communicated with Dr. Fine, and they decided that infection was the best diagnosis of the current difficulties.
On June 5, Gambardella reported purulent discharge and she was seen in the office on a Sunday by Dr. Fine. Fine was able to drain more fluid. She thought this was a good sign, as the vaginal cuff collection explained the prior symptoms, and drainage was an optimal treatment in itself. She prepared to culture some of the fluid and prescribed augmentin, a wide-range antibiotic, until she knew what the precise bacteria were.
On June 7, the patient returned to Dr. Ruffolo, who discontinued augmentin because she apparently had a reaction to it, and switched her to floxin and lomotril. By June 8, Dr. Fine had received the culture results and, in a telephone call, wanted to switch her to floxin. Of course, she already had switched. In any event, Dr. Fine saw Gambardella on June 9, and she reportedly felt better. She prescribed blood work and noted that she had been essentially afebrile for 72 hours. On June 24, Dr. Fine reviewed the results of the bloodwork and determined that it showed few, if any, signs of infection. At that point, Dr. Fine thought that Gambardella was doing well: at no point had any of the physicians found any sign of a tender abdomen or other specific symptom of a pelvic abscess.
On June 30, Dr. Fine saw Ms. Gambardella again, and at that point she thought the episode was concluded. She thought the patient had a resolved vaginal cuff collection, or an infected hematoma. Although there is nothing in the records to support an additional follow up appointment, Dr. Fine testified that her plan was to do repeat bloodwork in three to four weeks.
Ms. Gambardella saw Dr. Ruffolo in August and September, 1994, for several apparently minor complaints such as ear infection and cough. He did, however, administer at least two more steroid shots for one thing or another. On September 27, however, Dr. Ruffolo found a tender mass in the right abdomen and prescribed cipro. On October 4, she had an ultrasound, which confirmed a mass. Ruffolo referred her to Dr. Amodio, a general surgeon, and on October 8 a CT scan confirmed the mass. Dr. CT Page 13911 Amodio insisted that she return to Dr. Fine, who had done the first surgery. Ms. Gambardella had apparently become dissatisfied with Dr. Fine and was somewhat reluctant to return to her. On October 11 Dr. Fine examined her and confirmed the pelvic abscess. An informed consent was obtained, and on October 12 the abscess was surgically addressed. At first Dr. Fine tried to drain the abscess vaginally, but that procedure was unsuccessful.[4] She called in Dr. DeVito, a urologist, and together they opened the abdomen and removed the abscess, which was approximately 8-10 centimeters in diameter. The operation was difficult, partly because the abscess adhered to several organs. The operation ultimately was successful, although the appendix had to be removed because it could not readily be separated from the abscess and because it is Dr. Fine's procedure to remove the appendix in any event, when the occasion presents itself
Recovery was difficult. To guard against complications involving the bladder, a catheter was used for several days. She also had a collapse of some lung tissue with a suggestion of pneumonia, and diarrhea from the antibiotics, an insulted bowel from the surgery and a yeast infection from the antibiotics. The bacteria from the abscess proved to be enterococcus, but was apparently sensitive to different antibiotics from that gathered from the vaginal cuff site.
Dr. Fine saw Ms. Gambardella several more times after the surgery, and the recovery was relatively uneventful. She claims localized numbness and loss of sensation and fear of AIDS as a result of a blood transfusion.
In a medical malpractice action, or, perhaps more appropriately, a professional negligence action, the plaintiff has the burden to prove three elements: the relevant standard of care in the circumstances; a deviation from the standard of care; and harm caused by the deviation. Pisel v. Stamford Hospital,180 Conn. 314, 334-42 (1980). Expert testimony is, as a general proposition, required to establish the elements. Mather v.Griffin Hospital, 207 Conn. 125, 130-31 (1988).
The first element, as stated above, is the establishment of the applicable standard of care. The statutory definition appears in § 52-184c of the General Statutes: "[t]he prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as CT Page 13912 acceptable and appropriate by reasonably prudent similar health care providers." Treatment does not have to be perfect to meet the standard of care; rather, the standard is that degree of care ordinarily exercised by reasonably careful providers in the same circumstances. Wasfi v. Chaddha, 218 Conn. 200, 205 n. 7 (1991). The applicable standard of care does not necessarily prescribe only one course of conduct in a set of circumstances: there may be several choices which meet the standard of care, and, so longas the standard is met, there is no liability if the path chosen results in an unfortunate outcome. Wasfi, supra, 208-10.[5]
In her complaint, the plaintiff alleged the following deviations from the applicable standards of care: the vaginal hysterectomy should not have been performed; a vasoconstrictor was improperly used during surgery; the patient's blood was not cultured at the end of May; sample antibiotics which were given to the patient had expired; intravenous antibiotics were not timely administered; imaging procedures were not used (presumably during the late May to early June period of time); the site of infection was not determined during the same period; oral antibiotics were switched without proper diagnostic procedures' having been utilized; and no effective follow-up was carried out after June 30, 1994.
Dr. Henry Jacobs offered expert testimony on behalf of the plaintiff. He identified several areas in which he felt the appropriate care had not been given. His primary concern was that the infection should have been treated "systemically" with intravenous antibiotic therapy at the end of May and beginning of June; he also thought that imaging, most likely ultrasound, should have been utilized as of June 5, the day the vaginal cuff collection drained.[6] Somewhat less critically, he was not happy with the choice of the hysterectomy to begin with, as he felt it was more invasive than other available alternatives; he felt that the incision which was made in the October surgery should have been vertical rather than transverse; and he felt that the probing with the needle prior to the laparotomy of October 12 was excessive and perhaps should not have been done by anyone except a trained radiologist. He felt that she should not have been effectively discharged after the June 30 appointment.
Copies of articles from medical journals and texts were introduced into evidence by both sides. I have reviewed the literature presented. The points of view vary somewhat, perhaps partly as a function of the time written, but there is certainly CT Page 13913 not a consensus supporting the positions of Dr. Jacobs. For example, Sweet and Gibbs, Infectious Diseases of the FemaleGenital Tract 90 (2d Ed.), in a discussion of posthysterectomy pelvic abscesses, states that "[a]lthough they may, on occasion, respond to antimicrobial therapy, our recommendation for the management of posthysterectomy adnexal abscess(es) is to initiate antimicrobial therapy, which includes coverage for resistant anaerobes such as Bacteroides fragilis and to promptly proceed to exploratory laparotomy for extirpation and/or drainage of infected tissues."[7] The text also discusses (at 89) vaginal cuff collections and states that they "can be easily drained per vagina with resultant prompt response." The text does not suggest anything about a need for an aggressive course of systemic IV therapy, and is consistent with the defendant's assertion that the primary treatment mode is drainage. Similarly, in Gershenson, DeCherney and Curry, Operative Gynecology 49 (1993), the authors note that a pelvic abscess may be a secondary complication in hematomas, that imaging can be helpful in locating an abscess, and that "standard therapy for intra-abdominal abscess is surgical evacuation and drainage combined with appropriate parenteral antibiotics." The text suggests that drainage can often be achieved through a vaginal approach. Antibiotic therapy is also recommended.
There is a suggestion in some of the literature that subsequent abscesses may be caused, in part by the use of antibiotics.[8] See Ledger, et al. Adnexal Abscess as a LateComplication of Pelvic Operations, and Ledger, PostoperativePelvic Infections, 278-80.
In Schaefer and Graber, Complications in Obstetric andGynecological Surgery 121, 121 (1981), the authors suggest in general terms that "the cornerstone of therapy in pelvic infections is the use of systemic antibiotics", but the use of intravenous, in-patient treatment is not specifically recommended to the exclusion of other approaches. The use of "systemic" antibiotics also receives some support in Te Linde's OperativeGynecology, but not to the extent urged by Dr. Jacobs.
Dr. Benson Horowitz, a Hartford gynecologist, testified for the defendant. He stated that the standard of care for treatment of vaginal cuff infections, as a general proposition, is not IV therapy, but rather incision and drainage. Patients are not necessarily followed up with ultrasound imaging. He believed that the performance of the hysterectomy was, in the circumstances, CT Page 13914 within the standard of care. He testified that, in the circumstances, it was appropriate to have Ms. Gambardella seen by a gastroenterologist (Dr. LaGarde) in early June. He felt that the drainage procedure on June 5 was precisely the course to be followed, and he thought that it was appropriate to prescribe augmentin while awaiting the results of the culture. He testified that oral antibiotics have recently been essentially as effective as those administered intravenously in an in-patient setting. He believed that he probably would have followed up after June 30, but that there was no requirement, as she could well be considered benign at that point.[9] He believed that it was not inappropriate to try to drain the abscess vaginally in October, with the understanding that the procedure did not have a great likelihood of success.
I find the reasoning and conclusions of Dr. Horowitz to be the more persuasive.[10] Ms. Gambardella undoubtedly experienced trying times, and her anguish is not to be trivialized. Nonetheless, it is clear to me that Dr. Fine exercised a degree of skill, treatment and care which was well within the standard of similarly situated health care providers, and, at a minimum, the plaintiff's burden of proof on the issue of standard of care has not been met.[11]
Judgment may enter for the defendant.
Beach, J.