DEBORAH POREMBA, ADMINISTRATRIX (ESTATE
OF DANIEL LISI) *v.* YALE-NEW HAVEN
HOSPITAL ET AL.
(AC 29178)

Gruendel, Robinson and Borden, Js.

Argued November 12, 2008—officially released February 17, 2009

*Neil Johnson,* for the appellant (plaintiff).

*George Catlett,* with whom, on the brief, was *Bhavna Changrani,* for the appellee (defendant Craig S. Hecht).

GRUENDEL, J. This is a medical malpractice appeal about informed consent. The plaintiff, Deborah Poremba, administratrix of the estate of Daniel Lisi, appeals from the judgment of the trial court rendered after a jury trial in favor of the defendant Craig S. Hecht, a licensed physician.[1] The plaintiff claims that the court improperly determined that the defendant was not required to obtain written informed consent pursuant to General Statutes § 17a-543 (b) prior to performing any surgical procedure. We affirm the judgment of the trial court.

The relevant facts are as follows. The decedent, Lisi, had a history of schizophrenia, for which he received treatment at Harbor Health Services, an outpatient psychiatric care facility. Lisi lived independently with a roommate in an apartment in Branford. He never was declared legally incompetent or assigned a conservator and was able to make his own decisions and handle his financial affairs.

In addition to schizophrenia, Lisi suffered from severe obstructive sleep apnea. After nonsurgical treatment proved unsuccessful, Lisi was referred to the defendant, an otolaryngologist.[2] On January 5, 2001, the defendant met with Lisi and conducted a physical examination, which revealed a severe septal deviation,

---

[1] Also named as a defendant in the plaintiff's original complaint was Yale-New Haven Hospital. On September 22, 2003, the court granted Yale-New Haven Hospital's motion to strike all counts pertaining thereto without objection by the plaintiff. When the plaintiff failed to file a new pleading, the court, on November 7, 2003, rendered judgment in favor of Yale-New Haven Hospital pursuant to Practice Book § 10-44. The plaintiff has not appealed from that judgment. We therefore refer to Hecht as the defendant.

[2] "An otolaryngologist is a physician specializing in that branch of medicine concerned with medical and surgical treatment of the head and neck, including the ears, nose and throat." (Internal quotation marks omitted.) *Wasfi* v. *Chaddha*, 218 Conn. 200, 201 n.4, 588 A.2d 204 (1991).

a redundant uvular and soft pallet. The defendant recommended, as nonsurgical alternatives, that Lisi stop smoking and lose weight. The defendant advised Lisi of surgical options that included tracheostomy, which is "[a]n operation to make an opening into the trachea." T. Stedman, Medical Dictionary (28th Ed. 2006) p. 2007. The defendant also advised Lisi on an uvulopalatopharyngoplasty procedure that consisted of uvulopalatopharyngoplasty, septoplasty and turbinectomy.[3] It is undisputed that at the January 5, 2001 meeting, the defendant discussed with Lisi the benefits and risks of that procedure, including death.

On February 2, 2001, the defendant conducted with Lisi a consultation for surgery. They discussed an alternative surgical treatment option, tracheostomy, in which Lisi indicated his disinterest. The defendant again discussed with Lisi the risks of bleeding, velopharngeal insufficiency and death that accompanied the uvulopalatopharyngoplasty procedure. At that meeting, the defendant informed Lisi that he would need to obtain preoperative medical clearance.

Lisi thereafter met with physician Robert Henry on February 6, 2001. After examining Lisi and reviewing his laboratory data, Henry granted surgical clearance. His February 12, 2001 letter to the defendant stated in relevant part: "I recently saw . . . Lisi in preoperative evaluation prior to his upcoming surgery. Clinically, he has been doing well except for his persistent snoring and difficulty with sleep. He has not had any chest pain, or shortness of breath, and has had no complaints except those related to his septum and sleep apnea.

---

[3] Uvulopalatopharyngoplasty is the "surgical resection of unnecessary palatal and oropharyngeal tissue in selected cases of snoring, with or without sleep apnea." T. Stedman, supra, pp. 1406, 2080. Septoplasty is an "[o]peration to correct defects or deformities of the nasal septum, often by alteration or partial removal of skeletal structures." Id., p. 1750. Turbinectomy is the "[s]urgical removal of a turbinated bone." Id., p. 2056.

. . . In summary . . . Lisi has clinically been stable, and he is approximately a Goldman Class I risk, the lowest of four classes for his preoperative assessment. He is medically stable and appropriate for his upcoming surgery. From the perspective of his schizophrenia, that too, has been stable, and I see no contraindications to his upcoming surgery."

On March 20, 2001, approximately one week before Lisi's scheduled surgery, the defendant prepared a consent form titled "Yale-New Haven Hospital Permission for Operation, Special Procedure or Treatment." That document stated in part that the defendant had informed the patient "of the general purpose, potential benefits, possible hazards and inconveniences and alternatives to the above operation, special procedure or treatment along with any needed anesthesia/sedation, medication or transfusion." The defendant signed that portion of the document on March 20, 2001. At trial, the defendant testified that it is his custom to sign such consent forms one week prior to surgery outside the presence of the patient. He further testified that customarily, the patient then reviews and signs the consent form outside of the operating room on the day of surgery prior to the procedure. The defendant explained that Yale-New Haven Hospital required a consent form signed by the patient as a prerequisite to any surgical procedure.

The remainder of the consent form stated in relevant part that "[t]he general purpose, potential benefits, possible hazards and inconveniences of [uvulopalatopharyngoplasty], septoplasty [and] turbinectomy have been explained to my satisfaction by [the defendant] and alternatives have been discussed. I, Daniel Lisi, hereby consent to the performance of the operation, special procedure or treatment named above under [the defendant's] direction, along with whatever anesthesia/sedation, medication or transfusion is necessary, the risks,

benefits and alternatives of which have also been explained to me. . . . I further authorize my physician to do whatever may be necessary in the event that any unforeseen conditions arise during the course of the operation, special procedure, or treatment." On March 26, 2001, Lisi signed that consent form. The defendant performed the scheduled procedure on Lisi later that day without complications. The procedure completed, the defendant left Lisi in the care of the hospital's anesthesia staff while he met with Lisi's family.

While under the care of the anesthesia staff, Lisi suffered complications during extubation. Following extubation, Lisi began to thrash and desaturate.[4] Attempts to reintubate Lisi by the anesthesia staff were unsuccessful. The defendant, who was talking with Lisi's family at the time, responded to an emergency call and performed a cricothyroidotomy on Lisi.[5] Although that emergency procedure saved his life, Lisi never regained consciousness. He survived on life support for approximately nine months and died on January 9, 2002.

The plaintiff thereafter commenced this civil action against the defendant. The trial began on July 24, 2007, with an argument outside of the presence of the jury as to the applicability of § 17a-543 (b).[6] After hearing

[4] Desaturation is "[t]he act, or the result of the act, of making something less completely saturated; more specifically, the percentage of total binding sites remaining unfulfilled, e.g., when hemoglobin is 70 [percent] saturated with oxygen and nothing else, its d. is 30 [percent]." T. Stedman, supra, p. 521.

[5] A cricothyroidotomy is an "[i]ncision through the skin and cricothyroid membrane for relief of respiratory obstruction; used before or in place of tracheotomy in certain emergency respiratory obstructions." T. Stedman, supra, p. 460.

[6] General Statutes § 17a-543, titled "Procedures governing medication, treatment, psychosurgery and shock therapy," is part of the patients' bill of rights. Section 17a-543 (b) provides: "No medical or surgical procedures may be performed without the patient's written informed consent or, if the patient has been declared incapable of caring for himself or herself pursuant to sections 45a-644 to 45a-662, inclusive, and a conservator of the person has been appointed pursuant to section 45a-650, the written consent of such conservator. If the head of the hospital, in consultation with a physician,

from both parties, the court determined that § 17a-543 (b) pertains to "medical and surgical procedures for the treatment of psychiatric illnesses" and thus did not apply in the present case. Following trial, the jury returned a verdict in favor of the defendant. The court denied the plaintiff's subsequent motion to set aside the verdict and rendered judgment accordingly. The plaintiff now appeals.

On appeal, the plaintiff maintains that the court improperly concluded that the defendant was not bound by § 17a-543 (b) to obtain Lisi's written informed consent prior to performing the uvulopalatopharyngoplasty procedure. The plaintiff claims that the court improperly concluded that § 17a-543 (b) applies to medical and surgical procedures for the treatment of psychiatric illnesses. In the plaintiff's view, § 17a-543 (b) applies to *all* medical and surgical procedures. The defendant disagrees, arguing that the statute applies only to psychiatric patients receiving treatment for psychiatric illnesses. Because the surgical procedure at issue here pertained to sleep apnea and not a psychiatric illness, the defendant claims that § 17a-543 (b) did not require written informed consent prior to the procedure.

We need not decide that question of statutory interpretation. Following a trial, the jury rejected the plaintiff's allegation that the defendant failed to obtain

determines that the condition of an involuntary patient not declared incapable of caring for himself or herself pursuant to said sections is of an extremely critical nature and such patient is incapable of informed consent, medical or surgical procedures may be performed with the written informed consent of: (1) The patient's health care representative; (2) the patient's conservator or guardian, if he or she has one; (3) such person's next of kin; (4) a person designated by the patient pursuant to section 1-56r; or (5) a qualified physician appointed by a judge of the Probate Court. Notwithstanding the provisions of this section, if obtaining the consent provided for in this section would cause a medically harmful delay to a voluntary or involuntary patient whose condition is of an extremely critical nature, as determined by personal observation by a physician or the senior clinician on duty, emergency treatment may be provided without consent."

informed consent from Lisi. On appeal, the plaintiff does not challenge that factual determination. Cf. *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 141, 757 A.2d 516 (2000) (claim that trial court improperly instructed jury on doctrine of informed consent); *DeGennaro* v. *Tandon*, 89 Conn. App. 183, 188, 873 A.2d 191 (claim that "there was insufficient evidence for the jury to conclude that there was a lack of informed consent"), cert. denied, 274 Conn. 914, 879 A.2d 892 (2005); *Raybeck* v. *Danbury Orthopedic Associates, P.C.*, 72 Conn. App. 359, 379, 805 A.2d 130 (2002) (claim that court's jury instruction inadequate with respect to medical negligence and informed consent). Furthermore, it is undisputed that the defendant obtained Lisi's *written* informed consent prior to performing the uvulopalatopharyngoplasty procedure.[7] That signed consent provided, inter alia, that "[t]he general purpose, potential benefits, possible hazards and inconveniences of [uvulopalatopharyngoplasty], septoplasty [and] turbinectomy have been explained to my satisfaction by [the defendant] and alternatives have been discussed. I, Daniel Lisi, hereby consent to the performance of the operation, special procedure or treatment named above under [the defendant's] direction, along with whatever anesthesia/sedation, medication or transfusion is necessary, the risks, benefits and alternatives of which have also been explained to me." Lisi's signed consent was introduced into evidence at trial. Thus, irrespective of whether § 17a-543 (b) obligated the defendant to obtain written informed consent in the present case, it remains that the defendant complied with that requirement by procuring his patient's

---

[7] The defendant argues in his brief, as an alternate basis for affirmance, that he "complied with General Statutes § 17a-543 (b) by obtaining written informed consent from the patient for the nonpsychiatric procedure," a contention with which the plaintiff has not disagreed either by way of reply brief or at oral argument. Indeed, the plaintiff's brief makes no mention whatsoever of the written consent signed by Lisi on March 26, 2001.

written informed consent prior to proceeding with the surgical procedure.

The judgment is affirmed.

In this opinion the other judges concurred.