******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# LAURA KOS ET AL. *v.* LAWRENCE + MEMORIAL HOSPITAL ET AL.
## (SC 20256)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiffs, K and her husband, sought to recover damages from the
defendants, G, a physician, and G's medical practice, for personal injuries
that K had suffered in connection with G's alleged negligence in, inter
alia, failing to perform a proper and adequate episiotomy repair after
the birth of the plaintiffs' son. G had performed an episiotomy to facilitate
the delivery of the plaintiffs' son. After the delivery, G evaluated K
and diagnosed her with a third degree episiotomy extension, which G
repaired. After the repair was completed, G performed a digital examina-
tion of K's rectum and determined that there were no breaks or defects
in K's rectal mucosa. Although an exam of K's perineum the day after
the delivery indicated no issues with the repair, K subsequently reported
complications, including pain, an infection, and a rectovaginal fistula
that required surgery. At trial, the plaintiffs' expert witness, Y, testified
that the standard of care requires that a physician, after performing
an episiotomy, correctly diagnose and repair the episiotomy and any
extension thereof, which must involve a thorough rectal examination
before the repair. Y also testified that G failed to satisfy the standard
of care because, in failing to conduct a proper examination, G misdiag-
nosed and repaired the episiotomy extension as a third degree rather
than a fourth degree extension, and that this error led to the rectovaginal
fistula. According to the defendants' expert, L, G complied with the
standard of care, which required that the rectal exam be performed
after rather than before the episiotomy repair. L also testified that G had
correctly diagnosed and repaired a third degree episiotomy extension.
Finally, another expert witness presented by the defendants testified
that K's rectovaginal fistula was not caused by an unrepaired fourth
degree episiotomy extension but, rather, an infection. The trial court
instructed the jury that the plaintiffs had alleged that G breached the
standard of care by failing to identify a fourth degree episiotomy exten-
sion and by failing to properly examine and adequately repair a fourth
degree extension. The court also charged the jury on the acceptable
alternatives doctrine concerning the standard of care for conducting
the digital rectal examination. The jury returned a verdict in favor of
the defendants, finding that the plaintiffs had sustained their burden of
establishing the standard of care but failed to sustain their burden of
establishing that G breached the standard of care. On appeal, the plain-
tiffs claimed, inter alia, that the trial court improperly instructed the
jury by including a charge on the acceptable alternatives doctrine and
limiting their allegations regarding breach of the standard of care. *Held*:
1. Although the trial court improperly instructed the jury on the acceptable
   alternatives doctrine, that charge was harmless under the circumstances
   of the present case, and this court declined the plaintiffs' request to
   abolish that doctrine: the inclusion of an acceptable alternatives charge
   in the court's instructions was improper when the testimony of both
   parties' experts failed to establish that conducting a rectal examination
   either before or after the episiotomy repair was an acceptable method
   of diagnosing the particular degree of the extension, as Y testified that
   the examination should be performed before the repair, whereas L
   testified that it should be performed after the repair and that an examina-
   tion prior to the repair generally was not an approved method of diagnos-
   ing the degree of the extension, and when the parties argued during
   summation that there was only one proper method of examination to
   properly diagnose the degree of the extension and neither party argued
   that G chose between two acceptable alternatives in performing the
   examination after the repair; nevertheless, the trial court's improper
   inclusion of an acceptable alternatives charge in its jury instructions
   was harmless, as that error would not have confused or misled the jury

because, whether G properly performed the rectal examination mattered only if there was a fourth degree episiotomy extension, and the jury necessarily found that there was no fourth degree extension in finding that G did not breach the standard of care, and the improper charge did not otherwise interfere with the jury's determination regarding the credibility of the experts or exculpate G by suggesting that both methods of examination were accepted within the medical community; moreover, this court declined the plaintiffs' request to abolish the acceptable alternatives doctrine, as it determined that this case, in which the doctrine was held to be inapplicable, was not the appropriate case for deciding whether the doctrine should be abolished.

2. The trial court's supplemental instruction, in response to the jury's request for clarification, that the plaintiffs' expert, Y, testified that an internal rectal examination must be performed prior to an episiotomy repair as a required component of the standard of care, did not improperly limit the plaintiffs' allegations regarding breach of the standard of care: the trial court's response to the jury's request for clarification was consistent with the evidence presented at trial and how the plaintiffs' counsel had argued the case to the jury, and nothing in the supplemental instruction negated the plaintiffs' allegation that, by breaching the standard of care in failing to perform an examination before the repair, G failed to diagnose and repair a fourth degree extension; moreover, in reading the trial court's charge as a whole, this court determined that it was clear that the trial court instructed the jury that the plaintiffs' allegations regarding breach of the standard of care included insufficient inspection, diagnosis and repair of a fourth degree extension and, accordingly, would not have confused and misled the jury into determining that, even if a fourth degree extension had existed, the defendant did not breach the standard of care; furthermore, to the extent that the court's supplemental instruction did limit the plaintiffs' allegations, a second supplemental instruction by the court, which contained language nearly identical to the language the plaintiffs sought to include in the first supplemental instruction, cured any error in the first supplemental instruction.

Argued October 15, 2019—officially released March 10, 2020

*Procedural History*

Action to recover damages for, inter alia, medical malpractice, brought to the Superior Court in the judicial district of New London, where the action was withdrawn as to the named defendant et al.; thereafter, the case was tried to the jury before *Bates, J.*; verdict for the defendant Elisa Marie Girard et al.; subsequently, the court denied the plaintiffs' motion to set aside the verdict and rendered judgment in accordance with the verdict, from which the plaintiffs appealed. *Affirmed*.

*Alinor C. Sterling*, with whom, on the brief, was *Kathleen L. Nastri*, for the appellants (plaintiffs).

*Stuart C. Johnson*, with whom were *M. Karen Noble* and, on the brief, *Michael R. McPherson*, for the appellees (defendant Elisa Marie Girard et al.).

*Opinion*

D'AURIA, J. In this medical malpractice case, the plaintiffs, Laura Kos and Michael Kos,[1] appeal following the trial court's denial of their motion to set aside the jury's verdict in favor of the defendants Elisa Marie Girard and Physicians for Women's Health, LLC,[2] on the ground that the trial court improperly instructed the jury by (1) including a charge on the acceptable alternatives doctrine, and (2) limiting their allegations regarding Girard's breach of the standard of care. Alternatively, they request that this court abolish the acceptable alternatives doctrine. Although we agree with the plaintiffs that the trial court improperly instructed the jury on the doctrine of acceptable alternatives, because we find this error harmless and because we decline to take this opportunity to abolish the acceptable alternatives doctrine, we affirm the judgment of the trial court.

Reading the record, as we must, in the light most favorable to sustaining the verdict for the defendants, reveals that the jury reasonably could have found that, on August 19, 2011, the plaintiff gave birth to a son at Lawrence + Memorial Hospital in New London. Girard, who was employed by Physicians for Women's Health, LLC, in Groton, was the physician on call at the time. During labor, after the plaintiff had been pushing for approximately two hours, Girard decided to use a vacuum to assist in the delivery. When Girard's use of the vacuum was unsuccessful, Girard performed a median episiotomy—a surgical cut made in the perineum (the muscular area between the vagina and the anus) from the vagina toward the rectum—to reduce the tight band of tissue around the baby's head that restricted his movements. Girard testified that this episiotomy was the equivalent of a second degree laceration. See footnote 3 of this opinion.

After performing the episiotomy, Girard successfully delivered the plaintiffs' son. Because Girard had used a vacuum and had performed an episiotomy, the plaintiff was at risk of sustaining an extension of the episiotomy, requiring Girard to inspect the plaintiff's vaginal tissue. An extension of the episiotomy is diagnosed by degree, with first degree involving the least amount of tissue trauma and fourth degree involving the most severe trauma.[3]

In conducting the inspection, Girard first inspected the plaintiff's cervix and surrounding tissue, looking for tears, bleeding, or hematomas. Upon finding no issues, Girard then used a laparotomy pad (gauze) to block any bleeding from the uterus, which usually bleeds after a vaginal birth, and to have an unobstructed view of the lower vagina, perineal tissue, and rectum. Girard focused on the area of the episiotomy, inspecting for an extension. Through visual inspection and physical manipulation by gloved hands, Girard determined that

the episiotomy had extended through the plaintiff's anal sphincter, which was separated. Because of the injury to the anal sphincter, Girard was able to see the outer aspects of the rectal mucosa and to feel that it was intact. Because the rectal mucosa was intact but the anal sphincter was torn, Girard diagnosed the plaintiff with a third degree extension of the episiotomy, which she then repaired. See footnote 3 of this opinion.

After repairing the tear, Girard inspected the repair and conducted a digital rectal exam. Although Girard had examined the outer aspect of the rectal mucosa before the repair, she wanted to feel the internal side to ensure that the perineal body and sphincter muscles were adequately repaired, that bulk and tone were appropriate, that thickness between the tissue was appropriate, and that there were no breaks or defects. There was no indication of a tear or defect in the plaintiff's rectal mucosa. Girard did not conduct a digital rectal exam before the repair because she was trained to perform the exam *after* the repair to prevent contamination to the open wound.

The day after the delivery, prior to the plaintiff's discharge from the hospital, the repair of the perineum was inspected and found to be intact. The plaintiff's medical records do not indicate that, as of that time, she was complaining of discharging stool or flatus (gas) from her vagina. In a follow-up appointment, however, on September 1, 2011, she reported vaginal discomfort and stool coming out of her vagina. An opening in the episiotomy site of less than half a centimeter was noted, along with discharge that looked and smelled like stool. In a subsequent follow-up appointment with another physician, although the plaintiff did not bring any medical records with her, she reported that she had sustained a fourth degree extension of the episiotomy during birth and a rectovaginal fistula—an opening between her vagina and rectum. At that time, she complained of perineal pain and was concerned about having developed an abscess. An examination did not establish the existence of a rectovaginal fistula, but the plaintiff's symptoms—including the discharge and the smell—were consistent with a rectovaginal fistula. The opening in the vagina that previously had been noted was not detected. Additionally, the examination established that the plaintiff suffered from a sphincter separation.

The plaintiff later reported concerns that she had an infection, complaining of drainage from a hole in her perineum. She also complained of pain and redness, which, along with the drainage, were signs of infection. No rectovaginal fistula was detected. Upon further examination, Richard Bercik, an urogynecologist, noted that the episiotomy repair was intact but discovered a small rectovaginal fistula just inside the posterior fourchette and sphincter complex. John Gebhart, a uro-

gynecologist at the Mayo Clinic, also noted the existence of the rectovaginal fistula, as well as granulation tissue (a sign of infection), and two other openings in the vaginal wall, although neither led to the rectum. The size of the rectovaginal fistula was described as "a very small hole . . . ." The plaintiff thereafter underwent surgery to repair the rectovaginal fistula and the sphincter separation.

The plaintiffs later filed this medical malpractice case. In counts one and three of the operative complaint the plaintiff alleged claims of medical malpractice against the defendants. In counts two and four, the plaintiffs alleged claims of loss of consortium against the defendants on behalf of Michael Kos. Specifically, they alleged that Girard was negligent in that she had failed to identify a fourth degree extension of the median episiotomy, failed to perform a proper and adequate episiotomy repair, and failed to properly examine the episiotomy repair after it was complete. They alleged that Physicians for Women's Health, LLC, Girard's employer, was vicariously liable for Girard's negligence. They further alleged that, as a result of Girard's negligence, the plaintiff sustained serious injuries, including a rectovaginal fistula and an anal sphincter defect.

At trial, the plaintiffs presented the plaintiff's medical records, testimony from physicians who treated her after the birth of her son, and expert testimony from Brett C. Young, a maternal fetal medicine specialist, obstetrician and gynecologist. The defendants presented expert testimony from Frank Wen-Yung Ling, an obstetrician and gynecologist, as to the standard of care, and from Michael K. Flynn, a urogynecologist, as to causation.

At the close of evidence, the defendants requested that the trial court include a charge on the acceptable alternatives doctrine concerning the standard of care for conducting the digital rectal exam. The plaintiffs objected, but the trial court overruled the objection and gave the requested charge. After requesting clarification of the court's instructions; see part I A of this opinion; the jury reached a verdict in the defendants' favor. According to the jury interrogatories, the jury found that the plaintiffs had sustained their burden of establishing the standard of care but had failed to sustain their burden of establishing that Girard had breached the standard of care. The plaintiffs then filed a motion to set aside the verdict, arguing that the jury had been improperly instructed on the doctrine of acceptable alternatives. The trial court denied the motion. The plaintiffs appealed to the Appellate Court, and the appeal was transferred to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Additional facts will be set forth as required.

I

The plaintiffs first claim that the trial court improperly instructed the jury by including a charge on the acceptable alternatives doctrine because no evidence supported the charge. The plaintiffs argue that, to give the instruction, an expert had to testify that there was more than one proper technique for conducting the digital rectal exam, and that the experts' dueling opinions about when to conduct the exam—before or after the episiotomy repair—was not the equivalent of testimony that either option was an acceptable alternative.[4] The plaintiffs further contend that this improper charge was harmful because it was inapplicable and its inclusion interfered with the jury's assessment of credibility by exculpating the defendants and implying that Girard's actions were reasonable. Alternatively, the plaintiffs ask this court to abolish the acceptable alternatives doctrine.

The defendants respond that the acceptable alternatives charge was proper because there was evidence that there was more than one approved technique within the medical community. They contend that the evidence supports the charge as long as there is expert testimony supporting more than one proper method, even if an expert does not specifically state that both methods are acceptable. Alternatively, the defendants argue that any impropriety was harmless because it did not affect the central issue regarding liability—whether a third or fourth degree extension of the episiotomy occurred. Moreover, the defendants contest the plaintiffs' argument that the charge exculpated the defendants or interfered with the jury's credibility determination.

We agree with the plaintiffs that the acceptable alternatives charge was improper but agree with the defendants that it was harmless. Because we determine that any error was harmless, we decline to take this opportunity to abolish the acceptable alternatives doctrine.

A

The following additional facts and procedural history are necessary to our review of this claim. At trial, in addition to the plaintiff's medical records and testimony from her treating physicians, the plaintiffs offered Young's expert testimony. Young testified that the standard of care required that a doctor, after performing an episiotomy, must correctly diagnose and repair the episiotomy and any extension thereof. To do so, Young testified, a doctor must conduct a thorough examination before repairing the episiotomy and any extension. This includes a digital rectal exam, which involves placing a gloved finger into the anus and lifting up toward the vagina to identify whether the gloved finger can be seen from the vagina, meaning that a hole exists between the anus and the vagina. Young testified that the digital rectal exam must be conducted before

repairing the episiotomy because, otherwise, the extension will be repaired as a third degree extension, not a fourth degree extension, and, once repaired, it is more difficult to examine the rectal mucosa because the vaginal tissue is no longer "splayed" open.

Young opined that Girard failed to satisfy this standard of care "because she failed to identify a fourth degree laceration . . . [which] subsequently had the complication of breaking down and opening the sphincter . . . causing [the plaintiff to experience] incontinence and pain." The basis for this opinion was that, by failing to conduct a proper exam, Girard misdiagnosed and repaired the episiotomy extension as third degree, rather than as fourth degree. Young testified that this error caused a rectovaginal fistula, which allowed for the passage of fecal matter and gas through the anus to the vagina, contaminating and weakening the repair of the anal sphincter. Young conceded, however, that, if the plaintiff had sustained only a third degree episiotomy extension, she had "no criticism of how [Girard] did the repair . . . ."

In contrast, Ling testified on behalf of the defendants that the standard of care required that a digital rectal exam be performed *after* an episiotomy repair, not before, and that Girard had complied with this standard of care. Specifically, he testified that, once the perineal muscles and anal sphincter tear, the rectal mucosa must be carefully inspected to determine whether there is a fourth degree extension. He testified that, first, the physician must conduct an external inspection using gloved hands to spread open the vaginal tissue to look at the laceration. Ling testified that a physician should be able to make a diagnosis after this visual inspection because, once the anal sphincter muscle is separated, the tissue will be splayed open so that the physician will either see the outside of the rectum (meaning there is a third degree extension) or the inside of the rectum and the rectal mucosa (meaning there is a fourth degree extension). He testified that it is "almost impossible" not to visually diagnose a fourth degree episiotomy extension.

Only after repairing the extension, according to Ling, does a physician then conduct a digital rectal exam, feeling for whether the rectal mucosa is intact and smooth. He explained that "[p]utting a gloved finger in the rectum before you do the repair is actually frowned upon by a lot of folks because of how easy it is to make a diagnosis without putting a gloved finger in the [rectum] and the fact that doing a gloved finger examination of the rectum is not itself innocuous, meaning there are negative consequences. . . . When you do fix it or repair it, it would be compromised by more bacteria or more contamination, which could cause a breakdown and can cause more problems . . . [like] a greater chance of infection or failure of that episiotomy

[repair]. You might even worsen a problem by creating a hole by putting your finger in the rectum." Because of these risks, Ling opined, the standard of care does not require a rectal exam before the episiotomy repair, but, rather, such a procedure "goe[s] beyond" the standard of care by "bring[ing] . . . additional risks . . . ."

Although Ling testified that Girard had complied with the standard of care regarding her inspection technique, he further testified that his opinion as to that issue was irrelevant because he also opined that Girard correctly had diagnosed and repaired a third degree extension. In other words, whether a digital rectal exam occurred before or after the repair mattered only if there was a fourth degree episiotomy extension because this exam was not required to diagnose and repair a third degree episiotomy extension. Nevertheless, Ling conceded that, if the plaintiff had sustained a fourth degree episiotomy extension, Girard would have breached the standard of care by diagnosing and repairing it as a third degree episiotomy extension, thereby not repairing the torn rectal mucosa.[5]

As to causation, the defendants offered the testimony of Flynn, who opined that the plaintiff's rectovaginal fistula was not caused by an unrepaired fourth degree episiotomy extension but, rather, by an infection. More specifically, Flynn explained that a fourth degree extension and a rectovaginal fistula are separate and distinct injuries. A fourth degree extension is an "acute event" where there has been a tear through the rectum, whereas a rectovaginal fistula is a "chronic condition" of an opening that connects the lumen of the rectum and the lumen of the vagina, usually brought about by infection. Even without a fourth degree extension, a rectovaginal fistula may result after a properly repaired third degree extension because the tissue has been stretched and compromised.

Flynn opined that this is what occurred in the present case: "The most likely reason she developed a fistula, she got an infection in the perineum and the episiotomy repair, a small infection. . . . That drained through the posterior fourchette, which is what [was seen at her first follow-up appointment]. As soon as that abscess drained . . . the infection's not gone, but that little pocket of pus is gone, it closed up. That's why on subsequent examinations it [was not discovered by any other physicians]. But the problem is, you still have that bacteria, you still have that pocket. . . . That infection hasn't resolved, and as that part closes off on the perineum, now it's tracking toward the rectum where you've got an area of weakened mucosa . . . where an infection can tract and it tract[s] right down to the anus where it opens up into the anus to create the fistula tract." He also opined that the anal sphincter separation was not a result of a fourth degree episiotomy extension

but, rather, occurred because the anal sphincter is a muscle that is difficult to repair as the muscle causes the sutures to stretch and fail over time.

Flynn further opined that it was very unlikely that an undiagnosed fourth degree extension would have caused the plaintiff's rectovaginal fistula. First, the fistula did not occur in the area of the episiotomy repair but, rather, in the posterior fourchette. Second, if there had been a fourth degree laceration, it would have been difficult not to diagnose the rectovaginal fistula by visual inspection once the sphincter was separated, splaying the vagina open. Third, because the hole in the rectal mucosa was so small, if it had been present right after the delivery, it would have healed on its own once the other layers of the laceration had been repaired. Fourth, due to the small size of the hole in the rectal mucosa, only liquid stool, but not solid stool, would have been able to pass through it—contrary to the plaintiffs' allegations. If liquid stool had been passing through this hole since the day of delivery, the bacteria would have permeated the entire repair, and the repair would have opened up completely within two to five days. Additionally, the hole would have grown in size over time. Instead, the episiotomy repair was found to be intact.

During closing argument, neither party referred to the acceptable alternatives doctrine, despite the fact that the defendants had requested an acceptable alternatives charge. Rather, both parties argued that there was only one proper method of conducting the digital rectal exam—the plaintiffs argued that it had to occur prior to the repair, and the defendants argued that it had to occur after the repair. Moreover, although both parties discussed Girard's inspection technique, both argued that the crux of the case came down to whether there was a third degree or a fourth degree episiotomy extension. The plaintiffs' counsel described the case as follows: "So, the issue in this case is, was there a fourth degree laceration, right? That's the whole issue. Because if it's there, we know she missed it. . . . Third degree is the defendants' case. . . . Fourth degree is the plaintiffs' case." Similarly, the defendants' counsel summarized the case as "revolv[ing] around [whether there was] a third degree laceration that was properly repaired or a fourth degree laceration . . . ."

The trial court then instructed the jury that the plaintiffs had alleged that Girard breached the standard of care by failing to identify a fourth degree extension of the median episiotomy, and by failing to properly examine and to adequately repair a fourth degree extension. The trial court also charged the jury on the acceptable alternatives doctrine.[6]

After being instructed, the jury sought clarification as to whether it could "use the total testimony of all witnesses to ascertain the plaintiffs' definition of [the]

standard of care or only Dr. Young's testimony . . . ." The trial court responded by instructing the jury that it was "permitted to look at all of the evidence, including testimony, to determine the standard of care, and it is your obligation to determine the standard of care." The trial court then reread the standard charge on medical malpractice and the charge on reasonable alternatives. The plaintiffs' counsel again objected to the inclusion of the reasonable alternatives charge.

B

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation . . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error." (Internal quotation marks omitted.) *State* v. *Flores*, 301 Conn. 77, 93, 17 A.3d 1025 (2011).

It is well established that it is error to instruct the jury on a doctrine or issue not supported by the evidence offered at trial. See, e.g., *Stokes* v. *Norwich Taxi, LLC*, 289 Conn. 465, 484–85, 958 A.2d 1195 (2008); *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 575 and n.13, 898 A.2d 178 (2006); *Mack* v. *Perzanowski*, 172 Conn. 310, 312–13, 374 A.2d 236 (1977). "Jury instructions should be confined to matters in issue by virtue of the pleadings and evidence in the case." *Mack* v. *Perzanowski*, supra, 313. "[W]e review the evidence presented at trial in the light most favorable to supporting the proposed charge. . . . If . . . the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury." (Internal quotation marks omitted.) *Stokes* v. *Norwich Taxi, LLC*, supra, 484–85.

This court addressed the propriety of an acceptable alternatives instruction in *Wasfi* v. *Chaddha*, 218 Conn. 200, 588 A.2d 204 (1991). In *Wasfi*, a medical malpractice case, the central issue was whether a computerized axial tomography (CAT) scan should have been ordered before or after attempting to treat the plaintiff with carbogen inhalation therapy. Id., 202–203. "At the trial, experts on both sides testified concerning, inter alia, the propriety of [the defendant physician's] prescription of carbogen [inhalation] therapy prior to ordering a CAT scan. . . . [The physician's] counsel elicited expert testimony to the effect that the timing of the CAT scan—before . . . or after carbogen [inhalation] therapy—was a matter of professional opinion as to which physicians differed." Id., 203. On the basis of this testimony, this court held that the trial court properly

instructed the jury on the acceptable alternatives doctrine, which we described as "the settled principle that where the treatment or procedure is one of choice among competent physicians, a physician cannot be held guilty of malpractice in selecting the one which, according to his best judgment, is best suited to the patient's needs." (Internal quotation marks omitted.) Id., 208.

Unlike the present case, *Wasfi* did not involve two experts with dueling opinions regarding the proper procedure, with neither expert agreeing that the alternative procedure was acceptable in the medical community. This court in *Wasfi*, therefore, did not address whether the acceptable alternatives charge could be supported by experts with differing opinions. Rather, in *Wasfi*, an expert specifically testified that both procedures—ordering the CAT scan before or after the carbogen inhalation therapy—were acceptable in the medical community. Id., 210–11.

Since *Wasfi*, this court has not addressed this issue. We find instructive, however, this court's decisions regarding the schools of thought doctrine. Although that doctrine is separate and distinct from the acceptable alternatives doctrine, it is similar in that both doctrines recognize that there may be more than one acceptable approach to treating a patient. Under this doctrine, "the law will not judge between different medical schools of thought so long as a physician acts according to the standards within that school. . . . [This charge is proper only if there is evidence that the practitioner] adhered to a recognized school of good standing, which has established rules and principles of practice for the guidance of all its members, as respects diagnosis and remedies, which each member is supposed to observe in any given case." (Citation omitted; internal quotation marks omitted.) Id., 207–208.

In determining whether there is sufficient evidence to support a schools of thought instruction, this court has held that "a conflict in the evidence of the experts, as is to be expected in [medical malpractice] cases," is not sufficient to support the charge. *Geraty* v. *Kaufman*, 115 Conn. 563, 571, 162 A. 33 (1932); see also *Katsetos* v. *Nolan*, 170 Conn. 637, 653, 368 A.2d 172 (1976) (schools of thought instruction is proper when there is evidence of more than one school of thought recognized in medical community and defendant followed different school of thought than plaintiff's expert). Rather, there must be testimony that different schools of thought exist and what each school of thought requires regarding procedure and treatment. *Geraty* v. *Kaufman*, supra, 571; see also *Savoie* v. *Daoud*, 101 Conn. App. 27, 38–39, 919 A.2d 1080 (2007) (proper to instruct on schools of thought doctrine when expert testified about existence of two schools of thought).

It is the nature of medical malpractice cases that there often will be conflicting expert testimony regarding the standard of care. *Wasfi* makes clear that, similar to the schools of thought doctrine, the acceptable alternatives doctrine does not apply in every medical malpractice case but, rather, applies only when there is evidence of more than one acceptable method of inspection, diagnosis, or treatment. See *Wasfi* v. *Chaddha*, supra, 218 Conn. 211 ("the defendant physician who claims that he employed one of several alternative methods accepted within his profession has no less a task than any defendant physician: to offer credible expert evidence that his conduct was accepted within the profession, and to persuade the jury to believe that evidence" (emphasis omitted)).

Consequently, as with the schools of thought doctrine, competing expert testimony by itself is not sufficient to support the acceptable alternatives charge. For example, if expert A testifies that the standard of care requires diagnosis to be made using the X method, and expert B testifies that the standard of care requires diagnosis to be made using the Y method, the jury must decide between the two alternatives, with only one option satisfying the standard of care. There would be no evidence that both methods were acceptable alternatives because both experts testified that only one method would satisfy the standard of care. Rather, to justify the charge, a qualified expert must testify that there is more than one acceptable method of inspection, treatment, or diagnosis.

The evidence in the present case played out like the hypothetical just described: no expert testimony established that conducting the digital rectal exam either before the episiotomy repair or after the episiotomy repair was an acceptable method of diagnosing the level of degree of extension. Rather, the plaintiff's expert, Young, testified that the only acceptable method was to conduct this examination prior to the repair. In contrast, one of the defendants' experts, Ling, testified that this examination should be performed after the repair, to prevent contamination and infection. Additionally, Girard herself never testified that she made a choice regarding when to conduct the digital rectal exam but, rather, testified that she was trained to conduct this exam only after the episiotomy repair.

The defendants respond that there was evidence that both methods were acceptable alternatives because Ling never testified that a prerepair examination was a deviation from the standard of care; he merely testified that a prerepair examination was not required. The defendants focus on Ling's testimony that a prerepair digital rectal examination was "going beyond what the standard of care would require . . . ." The defendants take Ling's statement out of context, however. Ling did not testify that a prerepair examination went beyond

the standard of care in that it satisfied the standard of care by doing more than the standard of care required and, thereby, was an acceptable alternative to a postrepair examination. Rather, Ling testified that the standard of care does not require a prerepair examination because it "is actually frowned upon" and "discourage[d]" due to the increased likelihood of contamination and infection. Ling further testified that, because a prerepair examination can even create an opening in the rectum, "we don't encourage doing it unless it's absolutely necessary." Ling disagreed with Young that the standard of care required a prerepair examination, explaining that "[t]hat's going beyond what the standard of care would require, and it brings in the additional risks [of infection and creating an opening] by examining [the plaintiff] before the repair is done . . . ." Ling never opined that a prerepair examination was an acceptable alternative to a postrepair examination approved by the medical community. Rather, Ling testified that prerepair examination was a disapproved method of diagnosis unless "absolutely necessary."

Additionally, the defendants rely on Young's testimony to support the acceptable alternatives charge. Specifically, they point to Young's testimony that, although she opined that the standard of care required a prerepair examination, a postrepair examination could identify a fourth degree episiotomy extension. Again, the defendants take this testimony out of context. On cross-examination, Young testified that, in a previous deposition, she had testified that, after a repair is performed, a digital rectal exam can establish the existence of a fourth degree extension. Young clarified at trial that a tear of the rectum would be noticeable only during a digital rectal examination postrepair if the repair had been done improperly so that the three layers above the rectal mucosa remained torn, allowing the physician to see from the vagina through the tear to the rectal mucosa. In essence, Young's testimony was that a postrepair digital rectal exam was an acceptable alternative only if the physician was negligent in performing the repair. Accordingly, this record did not support an acceptable alternatives charge.

Moreover, neither party at trial argued that the expert testimony established that Girard chose between two acceptable alternatives in performing the digital rectal examination postrepair. Both parties argued during summation that there was only one proper method of examination to properly diagnose the degree of the episiotomy extension—the plaintiffs' counsel argued that the exam had to occur prerepair, whereas the defendants' counsel argued that the exam had to occur postrepair. The defendants' counsel even went so far as to argue that she "couldn't believe [that] . . . Young would even suggest that [a prerepair examination] was a good idea, much less the standard of care." Similarly, the plaintiffs' counsel noted that there was "no agree-

ment on the alternatives. . . . Young was very clear [that] the examination has to be done before you do the repair; [Ling] was very clear [that] you do the examination after the repair. There is no agreement on that." Although closing argument is not evidence itself, it is noteworthy that, at trial, not even the parties thought the evidence established that the competing inspection methods were acceptable alternatives.

In light of the evidence presented at trial, the trial court improperly instructed the jury on the acceptable alternatives charge.

C

The plaintiffs contend that this instructional error was harmful because merely injecting an inapplicable doctrine into the case creates a "substantial" likelihood of prejudice. More specifically, they argue that the charge " 'exculpate[d]' " the defendants and interfered with the jury's assessment of credibility by suggesting that both methods of inspection were reasonable as long as Girard used her "best judgment." The plaintiffs argue that the harm of this charge is evident from the jury's request for additional guidance regarding the standard of care, the trial court's repetition of the charge in response to the jury's clarifying questions, and the fact that this charge was the last charge the jury heard.[7]

The defendants respond that the improper charge was harmless because the dispositive issue at trial was not whether Girard breached the standard of care by performing the digital rectal examination after the episiotomy repair but, rather, whether a fourth degree extension of the episiotomy existed. To establish liability,[8] the plaintiffs had to prove that Girard failed to identify a fourth degree episiotomy extension and failed to properly examine and repair that fourth degree extension. The defendants contend that, because the jury found that Girard did not breach the standard of care, it necessarily found that no fourth degree extension existed, and, thus, the acceptable alternatives charge did not taint the verdict because whether Girard performed the proper exam mattered only if there was a fourth degree extension. The defendants contend that the instruction did not interfere with the jury's credibility determination or improperly exculpate Girard. We agree with the defendants.

"[N]ot every error is harmful. . . . [B]efore a party is entitled to a new trial . . . he or she has the burden of demonstrating that the error was harmful. . . . An instructional impropriety is harmful if it is likely that it affected the verdict. . . . [W]e consider not only the nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury, but the likelihood of actual prejudice as reflected in the individual trial record, taking into

account (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (Internal quotation marks omitted.) *Allison* v. *Manetta*, 284 Conn. 389, 400, 933 A.2d 1197 (2007); see also *Galligan* v. *Blais*, 170 Conn. 73, 78, 364 A.2d 164 (1976) ("for an error in the charge to be a ground for reversal, it must have been both material and prejudicial"). "A charge must be read in its entirety and is to be considered from the standpoint of its effect on the jury in guiding [it] to a correct verdict." (Internal quotation marks omitted.) *Dinda* v. *Sirois*, 166 Conn. 68, 74, 347 A.2d 75 (1974).

The inclusion of an inapplicable doctrine may be harmful if it confuses and misleads the jury, which may be evidenced by the jury's having requested additional guidance from the court on the doctrine; see, e.g., *State* v. *Torrence*, 196 Conn. 430, 438, 493 A.2d 865 (1985); *Conlon* v. *G. Fox & Co.*, 165 Conn. 106, 113, 328 A.2d 708 (1973); by the inapplicable charge being the last charge that a jury hears; *State* v. *Torrence*, supra, 437–38; *Velardi* v. *Selwitz*, 165 Conn. 635, 640–41, 345 A.2d 527 (1974); *Laffin* v. *Apalucci*, 128 Conn. 654, 658, 25 A.2d 60 (1942); or by repetition of the improper charge. See *State* v. *Flowers*, 278 Conn. 533, 542–43, 898 A.2d 789 (2006) (twice repeated improper jury instruction required reversal of judgment of conviction); *State* v. *Owens*, 39 Conn. App. 45, 55, 663 A.2d 1108 (twice repeated improper jury instruction required reversal in part of judgment of conviction), cert. denied, 235 Conn. 927, 667 A.2d 554 (1995).

Despite an instructional error, if the error did not affect the jury's verdict, courts of this state have found the error to be harmless. See, e.g., *Burke* v. *Mesniaeff*, 334 Conn. 100, 121–22, 220 A.3d 777 (2019) (holding that improper instruction was harmless when it did not taint jury's verdict); *State* v. *Acklin*, 9 Conn. App. 656, 666, 521 A.2d 165 (1987) (holding that instructional error was not misleading and, thus, not harmful when error did not affect principal issue in case); see also *State* v. *Torrence*, supra, 196 Conn. 438 ("[a] faulty definition of cognitive insanity cannot prejudice a defendant who claims volitional insanity"); *Caron* v. *Adams*, 33 Conn. App. 673, 685, 638 A.2d 1073 (1994) (despite instructional error, "[a] verdict should not be set aside where the jury reasonably could have based its verdict on the evidence"). Cases in which the inclusion of an inapplicable doctrine have been held harmful have involved the submission of an issue or doctrine that affected the jury's determination of liability. See *Faulkner* v. *Reid*, 176 Conn. 280, 281, 407 A.2d 958 (1978) (instructing on inapplicable special defense that affected determination of liability); *Miller* v. *Porter*, 156 Conn. 466, 470, 242 A.2d 744 (1968) (same).

In the present case, all the experts agreed that, if

there had been a fourth degree extension of the episiotomy, the standard of care would require Girard to diagnose it and to repair it as a fourth degree extension regardless of whether the digital rectal exam was performed before or after the episiotomy repair. Additionally, Young conceded that, if there was only a third degree extension, the repair was properly done and Girard did not breach the standard of care. Thus, regardless of whether the jury found either or both methods of *inspection* acceptable, there would be a breach of the standard of care only if the plaintiff had sustained a fourth degree episiotomy extension and Girard had failed to properly repair it. In other words, even if a prerepair exam was required for a fourth degree extension, if there was only a third degree extension, there would be no breach. If there was a fourth degree extension, regardless of whether a digital rectal exam was required before or after the repair, there would be a breach of the standard of care because the fourth degree extension was not diagnosed and repaired. The timing of the exam was relevant to the issue of breach only if the jury found there was a fourth degree episiotomy extension.

This is made clear by the court's recitation of the plaintiffs' allegations in its jury instruction, to which the plaintiffs did not take exception. See footnote 8 of this opinion. The trial court instructed that the plaintiffs had alleged that Girard breached the standard of care by failing "to identify a fourth degree extension of the median episiotomy" and by failing "to properly examine and adequately repair a fourth degree extension of the episiotomy." The allegations were premised on the existence of a fourth degree extension. Only if there had been a fourth degree extension would Girard have failed to properly inspect, diagnose, and repair it. In the absence of a fourth degree extension, there was no breach of the standard of care.

The jury interrogatories establish that the jury found that the plaintiffs had established the standard of care but that there was no breach of that standard of care. This necessarily means that the jury found that the plaintiff sustained a third degree, not a fourth degree, episiotomy extension. As explained, applying the plaintiffs' alleged standard of care, there would be a breach in the present case only if there had been a fourth degree extension, and there would be no breach only if there had been a third degree extension. Accordingly, whether Girard properly conducted the digital rectal exam did not affect the jury's verdict. As a result, the inapplicable acceptable alternatives charge, which was premised on the proper inspection technique, did not taint the jury's verdict. Because the jury's finding centered on whether there was a third or fourth degree episiotomy extension, the inclusion of this charge, which had no bearing on the degree of the extension, would not have confused or misled the jury and, there-

fore, was harmless. See *State* v. *Torrence*, supra, 196 Conn. 438 (holding that instructional error was not misleading, and thus not harmful, when error did not affect verdict, which was premised on different issue); *State* v. *Acklin*, supra, 9 Conn. App. 666 (same).

The out-of-state cases on which the plaintiffs rely in support of their argument that an inapplicable acceptable alternatives charge necessarily confuses and misleads the jury are distinguishable. In those cases, the erroneous acceptable alternatives charge was deemed harmful on the ground that it was reasonably probable that it affected the jury's verdict because the primary issue in each case was the propriety of the defendant physician's decision to use a certain inspection, diagnosis, or treatment method. See *Hirahara* v. *Tanaka*, 87 Haw. 460, 464–65, 959 P.2d 830 (1998) (improper wording of acceptable alternatives charge was harmful where charge was central to issue of liability); *Rogers* v. *Meridian Park Hospital*, 307 Or. 612, 619–20, 772 P.2d 929 (1989) (same); *Yates* v. *University of West Virginia Board of Trustees*, 209 W. Va. 487, 496, 549 S.E.2d 681 (2001) ("[b]ecause the primary issue . . . concerned the propriety of [the defendants'] decision to use interventional radiology rather than immediate surgery as the preferred method of treating [the plaintiff patient's] blockage, we find that there is a reasonable probability that the jury's verdict was influenced by the improper instruction"); see also *Leazer* v. *Kiefer*, 821 P.2d 957, 962 (Idaho 1991) (erroneous charge "misguided the jury in determining negligence").

The plaintiffs respond that harm is evident in the present case because the improper charge was repeated and it was the last charge presented to the jury. We have considered these factors in determining the prejudice of an inapplicable charge and have found them persuasive in cases in which the inapplicable charge tainted the jury's verdict and, thus, served to confuse and mislead the jury. See *Velardi* v. *Selwitz*, supra, 165 Conn. 639 (instructional error was harmful when it involved jury's determination of liability); *Conlon* v. *G. Fox & Co.*, supra, 165 Conn. 113 ("[the inapplicable charge] clearly was involved in [the jury's] deliberations"). As discussed, the acceptable alternatives charge did not taint the verdict in the present case because it did not affect the basis of the jury's verdict—the degree of the episiotomy extension. See, e.g., *Burke* v. *Mesniaeff*, supra, 334 Conn. 121–22 (holding that improper instruction was harmless when it did not taint jury's verdict).

Additionally, although the trial court repeated the acceptable alternatives charge in response to the jury's request for clarification, the court first reread the standard charge on medical malpractice, which was based on the model medical malpractice jury instructions on the Judicial Branch website. The court then reread the acceptable alternatives charge. The court continued its

supplemental charge by reminding the jury that "the plaintiffs have the burden of proving by a fair preponderance of the evidence that [Girard's] conduct represented a breach of the standard of care. Under our law, the plaintiffs must prove this by expert testimony. More specifically, they must establish through expert testimony both what the standard of care is and their allegation that [Girard's] conduct represented a breach of that standard. . . . Specifically . . . the plaintiffs have alleged that [Girard] . . . [breached the standard of care] in that she failed to identify a fourth degree extension of the median episiotomy and failed to properly examine and adequately repair a fourth degree extension of the episiotomy." Although the trial court repeated the acceptable alternatives charge, the court put it into context by reemphasizing that the plaintiffs' allegations were premised on a fourth degree extension, which must exist for the inspection technique issue to be material, thus diminishing any harm caused by the repetition of the inapplicable charge.[9]

The plaintiffs further argue that harm is evidenced by the jury's having sought clarification on the inapplicable charge. Although the jury sought clarification on the instruction, it did not seek clarification on the acceptable alternatives charge. Rather, the jury sought clarification on what evidence it could consider in determining whether the plaintiffs satisfied their burden of establishing the standard of care. The jury also sought clarification on whether the plaintiffs were asserting that a digital rectal exam had to be conducted before the repair to comply with the standard of care.

The plaintiffs argue that, although these questions were not specifically about the acceptable alternatives charge, they show that the jury was focused on the method of examination—the subject of the acceptable alternatives charge. We are not persuaded. These questions show that the jury was focused on the standard of care. As discussed, the standard of care involved the inspection technique only if the jury first found that a fourth degree extension had existed, which it did not find on the basis of its finding that there was no breach of the standard of care. Thus, the jury's focus on the standard of care did not necessarily suggest a focus on the acceptable alternatives charge.

Finally, the plaintiffs argue that the acceptable alternatives charge was harmful because it exculpated Girard and improperly interfered with the jury's determination of the experts' credibility by suggesting that both inspection methods were reasonable as long as Girard used her "best judgment." We disagree.

It is true that, if a jury finds that expert testimony establishes that there were acceptable alternative methods for conducting an inspection and that a defendant reasonably chooses from among those options, the defendant avoids liability. See *Wasfi* v. *Chaddha*, supra,

218 Conn. 209 ("physicians may choose between alternative acceptable methods without incurring liability solely because that choice may have led to an unfortunate result"). This does not mean, however, that charging the jury on the acceptable alternatives doctrine exculpates the defendant. As this court in *Wasfi* explained, the doctrine does not "[shield] a defendant physician from liability every time experts differ concerning his choice of techniques." Id., 211. Rather, the jury still must determine whether both of the competing methods were acceptable in the medical community and whether the defendant's use of a particular method breached the standard of care.

Despite its flaws, the acceptable alternatives charge did not require the jury to exculpate Girard. Rather, the charge informed the jury that it must decide whether there was more than one recognized method of inspection and, if there was, then determine whether the "method [used] was consistent with the skill, care, and diligence ordinarily had and exercised by other specialists in her field in like cases at the time that she provided treatment." Similarly, the charge did not interfere with the jury's determination of credibility by suggesting that both methods of inspection were reasonable. The charge properly left the jury to determine whether the expert testimony established that both methods of inspection were accepted in the medical community. Moreover, the jury did not need to reach this issue unless it found that a fourth degree episiotomy extension had existed. It did not.

Accordingly, on the basis of this record, the trial court's improper inclusion of the acceptable alternatives charge was harmless.[10]

## II

The plaintiffs' final claim of instructional error is that the trial court's supplemental charge to the jury improperly limited their allegations of breach of the standard of care to improper inspection, rather than more broadly to improper inspection, diagnosis, and repair of a fourth degree episiotomy extension.[11] According to the plaintiffs, even if Girard properly conducted the inspection, she still could have breached the standard of care by failing to diagnose and repair a fourth degree episiotomy extension. The plaintiffs argue that this improper supplemental instruction was harmful because, by narrowing the allegations of breach to the inspection technique, the trial court focused the jury's attention on the improper acceptable alternatives charge, which was based on the inspection technique.

The defendants respond that the trial court's supplemental instruction was proper because, although the plaintiffs alleged that Girard improperly inspected, diagnosed, and repaired the episiotomy extension, the improper diagnosis and repair were premised on the

improper inspection. In other words, the only evidence of breach of the standard of care was that Girard improperly conducted the digital rectal examination postrepair, causing her not to be able to visualize the tear in the rectal mucosa, and thereby causing her not to be able to diagnose and repair that tear. We agree with the defendants.

The following additional procedural history is relevant to this claim. After being instructed, the jury sought clarification on whether "the plaintiff[s] assert that an internal rectal exam must be completed before repair as a required component of the standard of care." The trial court proposed to respond that "[t]he plaintiffs' expert, [Young], testified that an internal rectal exam must be performed before a repair in order to comply with the standard of care." The plaintiffs' counsel objected, arguing that the jury did not ask what the expert had testified to but what the plaintiffs were asserting, which was broader—that the standard of care required Girard to properly inspect, diagnose and repair the fourth degree extension. The plaintiffs' counsel recognized the specifics of Young's testimony but argued that the trial court's response was too narrow. The trial court disagreed and gave the supplemental instruction that it had proposed.

"In evaluating a claim that a supplemental charge is erroneous we must examine both the main and supplemental charge as a whole to determine whether the jury could reasonably have been misled. . . . We must recognize, however, that [a] supplemental charge . . . enjoy[s] special prominence in the minds of the jurors because it is fresher in their minds when they resume deliberation." (Citation omitted; internal quotation marks omitted.) *State* v. *Williams*, 199 Conn. 30, 41, 505 A.2d 699 (1986). Although "additional instructions given in immediate response to a request are more informal and expressed with less exactness than are studiously prepared formal charges"; (internal quotation marks omitted) id., 43; "[t]he test to be applied to the charge is whether it fairly presents the case to the jury." *State* v. *Edwards*, 163 Conn. 527, 537, 316 A.2d 387 (1972).

The trial court's response to the jury's question regarding the plaintiffs' allegations was consistent with the evidence presented at trial and how the plaintiffs' counsel had argued the plaintiffs' case to the jury. See *Blatchley* v. *Mintz*, 81 Conn. App. 782, 787–88, 841 A.2d 1203 ("court properly tailored its instructions to reflect the issues actually before the jury"), cert. denied, 270 Conn. 901, 853 A.2d 519 (2004); see also *Stokes* v. *Norwich Taxi, LLC*, supra, 289 Conn. 476, 485 (charge must be supported by evidence and adapted to issues in case). The evidence offered in support of the plaintiffs' theory that Girard breached the standard of care came from Young, who testified that Girard improperly failed

to conduct the digital rectal exam before the episiotomy repair, which caused her to misdiagnose and improperly repair the fourth degree extension as a third degree extension because a fourth degree extension can be identified only before the repair. The plaintiffs' allegations that Girard breached the standard of care by failing to diagnose and repair a fourth degree extension were premised on a failure to conduct the digital rectal exam prior to the repair. The plaintiffs' counsel argued in summation that the plaintiff sustained a fourth degree episiotomy extension and that, because there was a fourth degree episiotomy extension, the standard of care required a prerepair digital rectal exam, without which Girard could not properly diagnose and repair the degree of the extension.[12] Under the plaintiffs' theory of the case, the jury first had to find that a fourth degree episiotomy existed and then had to find that Girard failed to properly diagnose and repair it, which was caused by Girard's failure to conduct a prerepair digital rectal exam. In light of this and the more informal nature of supplemental instructions, it was proper for the trial court to instruct the jury that the plaintiffs were asserting that a prerepair digital rectal exam was a component of the standard of care.

The crux of the plaintiffs' argument appears to be that, in light of the trial court's improper charge on the acceptable alternatives doctrine, its supplemental charge was improper because, when looking at those two portions of the jury instructions together, the jury could have improperly found that, although there was a fourth degree episiotomy extension, insofar as both inspection methods were reasonable, there was no breach of the standard of care, which was limited to the inspection technique. We are not persuaded that the supplemental instruction improperly limited the allegations and had this effect.

The jury asked if a prerepair exam was *a component* of the plaintiffs' alleged standard of care. The trial court responded in the affirmative. Nothing about this response negates the plaintiffs' allegation that, as a result of breaching the standard of care by failing to perform a prerepair inspection, Girard failed to diagnose and repair a fourth degree extension. Under the plaintiffs' theory of the case, assuming there was a fourth degree episiotomy extension, a failure to perform the prerepair exam was a necessary first component in a breach of the standard of care.

Furthermore, this charge must be read in context as part of the entire instruction. See, e.g., *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 606, 662 A.2d 753 (1995). In its original charge, the trial court stated that the plaintiffs had alleged that Girard breached the standard of care "in that she, [a], failed to identify a fourth degree extension of the median episiotomy or, [b], failed to properly examine and ade-

quately repair a fourth degree extension of the episiotomy." After the supplemental charge at issue, the jury requested clarification on what evidence it could consider in determining if the plaintiffs established the standard of care, in response to which the trial court again stated the plaintiffs' allegations regarding breach of the standard of care as "[a failure] to identify a fourth degree extension of the median episiotomy and [a failure] to properly examine and adequately repair a fourth degree extension of the episiotomy." This charge, which was nearly identical to the language that the plaintiffs sought to have the court include in the first supplemental charge, was the last charge the jury heard. See footnotes 9 and 11 of this opinion. Thus, to the extent that the first supplemental charge did limit the plaintiffs' allegations, the second supplemental charge cured any error. See *State* v. *Snook*, 210 Conn. 244, 271, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989). When we examine the charge as a whole, as we must, we conclude that it is clear that the trial court instructed the jury that the plaintiffs' allegations regarding breach of the standard of care included insufficient inspection, diagnosis, and repair of a fourth degree episiotomy extension. The jury instructions as a whole would not have confused and misled the jury into determining that, even if a fourth degree episiotomy extension had existed, Girard did not breach the standard of care.

Accordingly, we conclude that the trial court did not improperly limit the plaintiffs' allegations regarding breach of the standard of care in responding to the jury's request for clarification of the jury instructions.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] Because Michael Kos' loss of consortium claims are derivative of Laura Kos' medical malpractice claims, we refer to Laura Kos as the plaintiff, to Michael Kos by his name, and to them collectively as the plaintiffs.

[2] Lawrence + Memorial Hospital and Thameside OB/GYN Center, P.C., also were named as defendants, but the plaintiffs withdrew the action as to those defendants prior to trial. We therefore refer in this opinion to Girard and Physicians for Women's Health, LLC, as the defendants.

[3] A first degree episiotomy extension is a superficial laceration involving the vaginal mucosa—the lining of the vagina—and the perineal body. A second degree episiotomy extension is a deeper tear into the tissue, going beyond the vaginal mucosa and perineal body into the bulbocavernosus muscles, as well as extending into the perineal body—the area between the anus and the vagina. A third degree episiotomy extension includes a second degree extension and extends to the perineal muscles and anal sphincter but does not include the rectal mucosa—the lining of the rectum. A fourth degree episiotomy extension includes a third degree extension and extends to the rectal mucosa.

[4] The plaintiffs also contend that the acceptable alternatives charge was improper because it included language regarding "schools of thought" and "best judgment." The plaintiffs argue that the "schools of thought" wording improperly conflates the acceptable alternatives doctrine with the schools of thought doctrine, two separate and distinct doctrines. The plaintiffs also argue that the "best judgment" wording improperly injects a subjective standard into a medical malpractice action, excusing Girard from liability and interfering with the jury's credibility determination. The plaintiffs did not object to the wording of the charge at the time of trial. Rather, they took a general exception to the charge being given at all, arguing that

no evidence supported it and that it improperly interfered with the jury's credibility determination because this kind of charge suggested that both methods of inspection were reasonable. At no time did the plaintiffs request that the trial court modify the language of the charge in any way. Although the plaintiffs mentioned the phrase, "schools of thought," they did not do so to object to the inclusion of this language in the charge but, in passing, in summarizing the holding of *Wasfi* v. *Chaddha*, 218 Conn. 200, 588 A.2d 204 (1991).

An objection to the giving of a jury instruction does not preserve an objection to the specific wording of the instruction. See *State* v. *Coleman*, 304 Conn. 161, 174, 37 A.3d 713 (2012); id., 173–74 (defendant failed to preserve specific objection to wording of charge when he objected at trial to charge on different ground); *State* v. *Johnson*, 288 Conn. 236, 287–88, 951 A.2d 1257 (2008) (same); *State* v. *Melendez*, 74 Conn. App. 215, 229, 811 A.2d 261 (2002) ("although defense counsel objected to giving the jury an instruction on consciousness of guilt, he did not object at any time to the wording of the instruction as given and therefore failed to preserve that issue for review"), cert. denied, 262 Conn. 951, 817 A.2d 111 (2003).

Although we hold that the claim was not properly preserved, we note that this court in *Wasfi* indicated that the phrase, "schools of thought," should not be included as part of the acceptable alternatives charge; *Wasfi* v. *Chaddha*, supra, 218 Conn. 208–209; see also id., 208 (noting "unfortunate use" of schools of thought language); but nonetheless concluded that the inclusion of this phrase in the acceptable alternatives charge, which was otherwise substantively correct, did not constitute instructional error or confuse the jury, which would not have been aware of the legal difference between the two doctrines. Id., 209. We also rejected the argument that the acceptable alternatives doctrine opened a "Pandora's Box" by injecting a subjective standard into the objective medical malpractice test. Id., 211. Specifically, we disagreed that the doctrine would shield a defendant from liability when experts have differing opinions or would take credibility determinations away from the jury because the doctrine requires defendants to offer expert evidence that acceptable alternatives exist and to persuade the jury to credit this evidence. Id.

[5] Flynn testified that, even if Girard had breached the standard of care by diagnosing and repairing a fourth degree episiotomy extension as a third degree extension, the plaintiff would not have necessarily sustained any damages because such a small hole would have healed on its own.

[6] The trial court instructed the jury as follows: "In this case, you have heard testimony from different physicians as to different ways to inspect and diagnose an episiotomy extension. Where there is more than one recognized method of treatment and not one of them is exclusively and uniformly used by all physicians in good standing, a health care provider is not negligent in selecting one, which, according to his or her best judgment, is best suited for the patient's needs, even if it turns out to be a selection not favored by another physician. Now, there may be more than one established system of treatment. The law does not favor or give exclusive recognition to any particular system of treatment over another. The law is that a physician is not bound to use any particular method or medical school of thought in treating a patient. When a physician of ordinary skill and learning recognizes more than one method of treatment as proper, the physician may adopt any such method without subjecting himself or herself to liability for an unfortunate result, so long as such method was consistent with the skill, care, and diligence ordinarily had and exercised by other specialists in her field in like cases at the time that she provided the treatment. Thus, if there was more than one established method of treatment recognized at the time, the test is not whether the physician adopted a method someone else might have adopted but, rather, whether the method adopted was one that was in compliance with reasonable skill, care, and diligence required of the particular school of thought embracing the method."

[7] The plaintiffs further argue that the harm caused by the improper charge was worsened by the improper wording of the charge, confusing the acceptable alternatives doctrine with the schools of thought doctrine and injecting a subjective "best judgment" standard into the objective medical malpractice standard. As explained in footnote 4 of this opinion, the merits of these claims are unpreserved. Nevertheless, we note that, in *Wasfi*, we held that the inclusion of the phrase, "schools of thought," in an acceptable alternatives charge, although incorrect, does not confuse or mislead the jury. See footnote 4 of this opinion. The charge at issue in the present case is nearly identical to the charge in *Wasfi*, and, as in that case, we fail to discern how the

inclusion of this phrase would create any additional confusion for the jury. Moreover, to the extent that the plaintiffs contend that the "best judgment" language was harmful, we address that argument, but, to the extent that the plaintiffs attempt to raise their unpreserved claim regarding whether the inclusion of the "best judgment" language was improper, we decline to review that issue.

[8] In the operative fifth amended complaint, the plaintiffs allege that Girard breached the standard of care by failing "to identify a [fourth] degree extension of the median episiotomy"; failing "to perform a proper and adequate episiotomy repair"; and failing "to properly examine the episiotomy repair after it was complete." To conform the allegations to the evidence presented at trial, the plaintiffs proposed to amend the complaint to allege that Girard breached the standard of care by failing "to identify a [fourth] degree extension of the median episiotomy" and by failing "to properly examine and adequately repair the [fourth] degree extension of the episiotomy." The trial court denied the plaintiffs' request to amend the complaint, but the trial court's instruction regarding the plaintiffs' allegations nevertheless tracked how the plaintiffs had set forth those allegations in their proposed sixth amended complaint.

[9] Additionally, contrary to the plaintiffs' contention, the acceptable alternatives charge was not the last charge that the jury heard, but, rather, the last charge was on the burden of proof and a summary of the plaintiffs' allegations centering on the disputed existence of a fourth degree extension. See *State* v. *Torrence*, supra, 196 Conn. 437–38 ("trial court's concluding instruction . . . refocused the jury's attention on the key concept [at issue] . . . and, in effect, acted as a curative instruction").

[10] Alternatively, the plaintiffs ask this court to abolish the acceptable alternatives doctrine because it is unnecessary in light of the standard jury instruction regarding medical malpractice, and because it misleads the jury and interferes with its credibility determination by suggesting that a physician is not liable if the physician's methods were subjectively reasonable. In light of this court's stare decisis jurisprudence and our holding that the acceptable alternatives charge in this case was harmless, we decline to take this opportunity to abolish the acceptable alternatives doctrine. "The doctrine [of stare decisis] requires a clear showing that an established rule is incorrect and *harmful* before it is abandoned." (Emphasis added; internal quotation marks omitted.) *Conway* v. *Wilton*, 238 Conn. 653, 660–61, 680 A.2d 242 (1996). Moreover, because we conclude that the acceptable alternatives doctrine was not applicable in this case, we determine that this is not the appropriate case for deciding whether the doctrine should be abolished.

[11] Specifically, after the plaintiffs' counsel objected to the trial court's proposed supplemental instruction as being too narrow, counsel requested that the trial court respond to the jury's question that the plaintiffs' allegations were that Girard breached the standard of care by failing to "carefully inspect and properly diagnose a fourth degree laceration."

[12] The plaintiffs' counsel argued: "So, step one is, was it a fourth degree [laceration]? . . . It was clearly a fourth degree laceration. [Step two is, was] it properly repaired? Well, no, it wasn't because [Girard] diagnosed what she thought and repaired what she thought was a third degree because she didn't properly examine the perineum for the laceration. So, that gets you through the standard of care. Properly examine, properly diagnose, properly repair. She didn't see the fourth degree because she didn't do the examination, [so] she didn't repair the fourth degree because she thought it was a third degree."